Gage, P.J.
 

 This case joins the legion of published opinions that interpret Michigan’s no-fault act because it involves yet another novel factual wrinkle to which neither this Court nor the Michigan Supreme Court previously has applied the law. This Court granted defendant’s delayed application for leave to appeal to resolve the primary question in whom should rest legal title to modified living quarters that defendant intends to prepare to accommodate plaintiff’s medical condition. Defendant challenges the trial
 
 *253
 
 court’s partial summary disposition order that awarded plaintiff title to the specialized accommodations and the court’s award of no-fault penalty interest to plaintiff. Plaintiff cross appeals the trial court’s determination of the amount of uncoordinated personal protection insurance (pip) benefits owed by the defendant. We affirm.
 

 i
 

 Plaintiff is a retired employee of the United States Post Office. In June 1996, plaintiff was involved in a motor vehicle accident that caused him very serious injuries, including quadriplegia. At the time of the accident, defendant was plaintiff’s insurer under the no-fault act, MCL 500.3101
 
 et seq.
 
 On June 9, 1997, plaintiff filed the instant suit, alleging that defendant unreasonably refused to pay plaintiff all pip benefits that it owed him.
 

 At the time of his accident, plaintiff owned a split-level house near Greenville, Michigan. Plaintiff, however, did not return to his house after the accident, because of his restriction to a wheelchair and limited ability to control his upper extremities. Plaintiff spent months recovering in hospitals in Grand Rapids after the accident, then entered a long-term care program in which he spent approximately one year. At the time of trial, he resided in a Grand Rapids area apartment. Plaintiff expressed to defendant his desire to return to his house.
 

 On June 1, 1998, the parties stipulated that defendant would evaluate plaintiff’s housing needs and “submit a proposal to the Plaintiff for his review and approval providing for either the modification of his
 
 *254
 
 existing residence in Greenville, Michigan, or the purchase or construction or [sic] an appropriate . . . residence in Greenville area.” A home remodeling company estimated that to renovate plaintiff’s house to accommodate his medical conditions would cost approximately $178,000. In light of this estimate, defendant declined to renovate plaintiff’s house, instead suggesting that it would rather purchase and renovate a ranch-style house.
 

 On January 7, 1999, plaintiff filed a motion for partial summary disposition pursuant to MCR 2.116(C)(9) (no valid defense) and (10) (no issue of material fact), seeking resolution of a dispute regarding whether plaintiff or defendant should retain title of whatever house defendant prepared for plaintiff’s use. Plaintiff also sought summary disposition with respect to defendant’s reimbursement of certain of plaintiff’s medical expenses that Blue Cross & Blue Shield of Michigan (bcbsm), plaintiff’s health insurer, partially had paid.
 
 [1]
 
 Regarding the house, plaintiff claimed that the no-fault act obligated defendant to provide him reasonable accommodation for his medical conditions and that to permit defendant to retain title to a house that defendant purchased and renovated would constitute a windfall for defendant because defendant eventually could sell the house, thus profiting from plaintiff’s catastrophic injury. Concerning medical expenses, specifically those plaintiff incurred between July 1996 and early 1997 at Mary Free Bed Hospital (mfbh), plaintiff argued that his policy with defendant required that defendant pay him
 
 *255
 
 uncoordinated medical benefits, specifically the full amounts charged for services by mfbh, $163,266.28, not the lesser amounts that bcbsm negotiated as payments in full, $ 84,099.89.
 

 Defendant responded by filing its own motion for summary disposition pursuant to MCR 2.116(C)(10). Regarding housing, defendant contended that as a matter of law, pursuant to MCL 500.3107 and the public policy underlying the no-fault act to minimize expenses, plaintiff was entitled to only a life estate interest in any house that defendant purchased and renovated to accommodate his medical needs. With respect to medical expenses, defendant acknowledged plaintiff’s entitlement to its payment of uncoordinated medical expenses, but asserted that its payment obligation was limited to the amounts that BCBSM had paid in satisfaction of plaintiff’s health providers’ charges.
 

 At the conclusion of the January 14, 1999, hearing regarding the motions, the trial court explained as follows its view regarding the property ownership issue:
 

 As far as the life estate is concerned, I can see a lot of practical problems which would make in this case, having a life estate an unreasonable situation for [plaintiff] to deal with. The maintenance problems, the question of whether it’s a question of maintenance, improvement, or repair, it’s going to be there for every thing. He has a house there. It benefits the people for having a claim of ownership so I think he’s entitled to have a residence that is modified to fit his circumstances in which he has the ownership because he currently has an ownership in a residence.
 

 I don’t think he’s entitled to have two residences so if there’s a new house purchased or another house built, he
 
 *256
 
 should have the fee title in that but he will give up his title in his existing home for it. I think his circumstances are distinguishable from the
 
 Kitchen
 
 [v
 
 State Farm Ins Co,
 
 202 Mich App 55; 507 NW2d 781 (1993)] case, partly from his age, partly from the fact that no other family members are living there. In fact, he currently owns a house and knows the benefits of ownership and I can see somebody who has had that, would not want to lose that right. In addition, I think it would be unreasonable to deal with all the repairs, improvements, and maintenance problems that could occur after this is resolved [if defendant maintained title to the property].
 

 The court also concluded that defendant should pay plaintiff uncoordinated benefits limited to the reasonable amounts that bcbsm paid plaintiff’s health care providers and that defendant should pay some amount of statutory and penalty interest on these amounts.
 

 On May 24, 1999, plaintiff moved for a determination regarding the amounts of interest that defendant owed. Defendant had paid plaintiff uncoordinated benefits amounting to $84,099.89 on January 28, 1999, but had not yet made any payments of interest. On June 3, 1999, the trial court ordered that pursuant to MCL 600.6013(5) defendant owed plaintiff $17,462.18 in prejudgment interest and that pursuant to MCL 500.3142(3) defendant had to pay plaintiff $14,801.57 in penalty interest accruing from August 17, 1997.
 

 n
 

 Defendant contends that to best serve the no-fault act goals of providing plaintiff’s necessary accommodations and containing no-fault insurance costs, the trial court’s grant of summary disposition should have ordered that plaintiff possess only a life estate in any
 
 *257
 
 house that defendant purchases and remodels. According to defendant, “payment for the purchase or construction of a home for the benefit of the insured in which legal title to the home is held by the insured is not payment of any ‘expense’ ” under MCL 500.3107, but the creation of an asset for the insured.
 

 This Court reviews de novo a trial court’s grant of summary disposition.
 
 Old Kent Bank v Sobczak,
 
 243 Mich App 57, 61; 620 NW2d 663 (2000). Plaintiff requested summary disposition pursuant to MCR 2.116(C)(9) and (10), but the trial court did not express under what subrule it deemed summary disposition appropriate. Because the material facts in this case are undisputed, and because the trial court’s order granting partial summary disposition interpreted as a matter of law whether MCL 500.3107(1)(a) permitted plaintiff to obtain title to the house defendant intends to refurbish for him, the trial court apparently granted summary disposition pursuant to MCR 2.116(C)(10).
 
 Bingham Twp v RLTD R Co,
 
 463 Mich 634, 641; 624 NW2d 725 (2001).
 

 A
 

 The no-fault act governs the relationship between the parties. The overall goal of the no-fault insurance system is to provide accident victims with assured, adequate, and prompt reparations at the lowest cost to both the individuals and the no-fault system.
 
 Celina Mut Ins Co v Lake States Ins Co,
 
 452 Mich 84, 89; 549 NW2d 834 (1996). The provision of the no-fault act at issue, MCL 500.3107(1), states in relevant part as follows:
 

 
 *258
 
 [PJersonal protection insurance benefits are payable for the following:
 

 (a) Allowable expenses consisting of all reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person’s care, recovery, or rehabilitation.
 

 To be reimbursed for an “allowable expense” under MCL 500.3107(l)(a), a plaintiff bears the burden of proving that (1) the charge for the service was reasonable, (2) the expense was reasonably necessary and (3) the expense was incurred.
 
 Spect Imaging, Inc v Allstate Ins Co,
 
 246 Mich App 568, 574; 633 NW2d 461 (2001).
 

 The no-fault act does not address with specificity to what extent an insurer must supply an insured accommodations in the form of housing. The language of the act focuses on reasonableness, requiring that the insurer pay for “all
 
 reasonable
 
 charges incurred for
 
 reasonably
 
 necessary . . . accommodations.” MCL 500.3107(l)(a) (emphasis added). Neither party disputes that the cost involved in defendant’s purchase and renovation of a house to suit plaintiff’s postaccident needs constitutes a reasonable charge for accommodations reasonably necessary to provide for plaintiff’s care and recovery. Accordingly, MCL 500.3107(l)(a) plainly requires that defendant shoulder the involved expenses pursuant to its contract with plaintiff. See
 
 Sharp v Preferred Risk Mut Ins Co,
 
 142 Mich App 499, 510-512; 370 NW2d 619 (1985), in which this Court noted, in a case involving the no-fault insured’s apartment rental expenses, that “[a]s long as housing larger and better equipped is required for the injured person than would be allowed if he were not injured, the full cost is an ‘allowable
 
 *259
 
 expense’ ” under MCL 500.3107(1)(a). The limited question in this case concerns whether defendant’s provision of title in plaintiff’s name likewise qualifies as a reasonable charge reasonably necessary for plaintiff’s care.
 

 We find that in this case, for several reasons, having title of the furnished house be in plaintiff’s name constitutes a reasonable charge reasonably necessary for plaintiff’s care. We first note defendant’s refusal to consider plaintiff’s strong and expressed desire to remain in and maintain ownership of the house that he currently owns, as he did before his accident. Had defendant entertained plaintiff’s wish that it remodel the house that he currently owns, plaintiff clearly would have retained title to his remodeled home. We further observe that to remain the owner of whatever altered accommodations defendant provides, plaintiff has averred his willingness to give up ownership in his current split-level house and contribute the amount of his equity toward defendant’s presumably less costly alternative suggestion to purchase and renovate an existing ranch house.
 
 [2]
 
 Plaintiff’s agreement to defendant’s alternative proposal and to contribute his existing equity of approximately $20,000 assists defendant in achieving the objectives of the no-fault act, to provide required benefits at the lowest cost to the system.
 
 Celina Mut, swpra
 
 at 89.
 

 Under these circumstances, were defendant likewise permitted to retain legal title to the renovated ranch house while granting plaintiff only a life estate
 
 *260
 
 interest, we could characterize the outcome of this case only as manifestly unreasonable. Defendant’s possession of legal title to the renovated house would entitle it to sell the property when plaintiff died, likely enabling defendant at least to recoup its investment in the house or earn a profit. Thus, if defendant retained ownership of and sold the property, defendant would receive a windfall by being reimbursed for, and effectively avoiding, its statutory and contractual obligation to compensate plaintiff for his reasonably necessary reasonable medical expenses.
 

 We reiterate that we find unreasonable under MCL 500.3107(l)(a) defendant’s refusal to renovate plaintiff’s existing house and its refusal at the same time to deny plaintiff an ownership interest in the cheaper-to-renovate ranch house, at least in this case in which plaintiff remains willing to contribute to defendant the equity existing in his current house. Under the undisputed and unique circumstances of this case, we conclude that defendant’s conveyance of title to the renovated ranch house to plaintiff, in exchange for plaintiff’s contribution of his existing equity in his house to defendant, as a matter of law qualifies as a “reasonable charge[] incurred for reasonably necessary . . . accommodations for an injured person’s care, recovery, or rehabilitation.” MCL 500.3107(l)(a).
 
 [3]
 
 See also
 
 Nasser v Auto Club Ins Ass’n,
 
 435 Mich 33, 55; 457 NW2d 637 (1990) (noting that while the question whether expenses are reasonable and reasonably nec
 
 *261
 
 essary is generally one of fact for the jury, if it could be said with certainty that an expense was both reasonable and necessary, the court could make this decision as a matter of law).
 

 B
 

 Both before the trial court and on appeal, the parties have disputed the significance of this Court’s opinion in
 
 Kitchen, supra,
 
 with respect to this case, which matter we now briefly address. In
 
 Kitchen,
 
 a motor vehicle accident rendered the plaintiffs’ six-year-old child, Elisha, a quadriplegic. In light of a doctor’s determination that Elisha required special long-term housing accommodations, her parents and the defendant, their no-fault insurer, stipulated that the defendant would pay $17,332 toward purchasing four lots to be used as the site of a suitable new house and $239,782.41 toward the construction of the house, while the parents would contribute $68,561.41 for the construction of the new house. The trial court subsequently determined that legal title to the new house would be held by an independent neutral corporate trustee that would hold the property in trust for Elisha during her lifetime.
 
 Id.
 
 at 57. The trial court further ordered that (1) despite their intention to reside in the new house with Elisha, the parents did not have to contribute the existing equity in their present house toward the purchase of the new house, (2) the parents and the defendant would pay insurance and property taxes on the new house pro rata according to the proportions of their contributions toward the purchase of the house, (3) the parents would pay for all utilities and maintenance charges while they resided in the new house, after which such costs
 
 *262
 
 would become the defendant’s obligation, and (4) in the event that Elisha ever failed to reside in the new house for 180 consecutive days, the house could be sold and the net proceeds of the sale divided between the parents and the defendant proportionate to their respective contributions toward the purchase of the house.
 
 Id.
 
 at 57-58.
 

 The parents on appeal argued that Elisha should possess title to the new house because the house constituted a reasonable accommodation under MCL 500.3107(l)(a) for which the defendant was responsible.
 
 Kitchen, supra
 
 at 58. This Court disagreed, explaining as follows:
 

 It is undisputed that the new house will provide reasonable and proper accommodations to Elisha, as required by MCL 500.3107(l)(a) . . . , and in addition will house the Kitchen family. As defendant notes, however, no one has ever suggested that it is necessary for Elisha’s care that she hold legal title to the home in which she lives.
 
 We agree with defendant that as long as it satisfies its statutory obligation to pay for all reasonable charges incurred for those products, services, and accommodations reasonably necessary to meet Elisha’s needs, defendant should be allowed to choose the least expensive adequate means of providing those items. This is completely consistent with the goal of the no-fault insurance system, xohich is to provide victims of motor vehicle accidents assured, adequate, and prompt reparation for certain economic losses at the lowest cost to both the individual and the no-fault insurance
 
 system.... Ordering that Elisha have a life estate in a home that provides her with the necessary accommodations to meet her reasonable needs satisfies the requirements of MCL 500.3107(l)(a) .... Declining to award Elisha unencumbered legal title to a home in which defendant has a quarter-million-dollar investment simultaneously operates as a cost-containment measure that benefits the no-fault insurance system. Because both Elisha’s needs and the
 
 *263
 
 goals of the no-fault act are met by holding the property in trust for Elisha during her lifetime, we find no error in the trial court’s order.
 
 [Id.
 
 at 58-59 (emphasis added).]
 

 Defendant suggests that by analogy, plaintiff should only receive a life estate interest in whatever house it renovates for him.
 

 We observe, however, that this Court in
 
 Kitchen
 
 did not proclaim that in every case in which an insurer builds or renovates a house for an injured insured the insured is entitled to only a life estate while the insurer retains legal title to the property. Significant differences exist between
 
 Kitchen
 
 and the instant case. Unlike this case, in
 
 Kitchen
 
 the injured insured party was a minor child and the minor’s parents did not give up their equity in their existing house.
 
 Id.
 
 at 57. Furthermore, it appears that the trial court in
 
 Kitchen
 
 ordered that an independent corporate trustee hold legal title to the newly constructed house because of the minor’s age and because the minor’s parents and the insurer disputed the extent of their respective ownership interests in the property. Moreover, in regard to defendant’s contention that pursuant to
 
 Kitchen
 
 it is entitled to choose the least expensive adequate means of providing plaintiff suitable housing, we emphasize that defendant already has been afforded this option—defendant declined to renovate plaintiff’s existing house in favor of the more cost-effective renovation of a ranch house.
 

 Accordingly, we conclude that the trial court properly resolved the house ownership issue.
 
 [4]
 

 
 *264
 
 m
 

 Defendant next argues that the trial court incorrectly awarded plaintiff penalty interest pursuant to MCL 500.3142(2), which provides in relevant part as follows:
 

 Personal protection insurance benefits are overdue if not paid within 30 days after an insurer receives reasonable proof of the fact and of the amount of loss sustained.
 
 If reasonable proof is not supplied as to the entire claim, the amount supported by reasonable proof is overdue if not paid within 30 days after the proof is received by the insurer. Any part of the remainder of the claim that is later supported by reasonable proof is overdue if not paid within
 
 *265
 
 30 days after the proof is received by the insurer. [Emphasis added.]
 

 Penalty interest must be assessed against a no-fault insurer if the insurer refused to pay benefits and is later determined to be liable, irrespective of the insurer’s good faith in not promptly paying the benefits.
 
 Davis v Citizens Ins Co of America,
 
 195 Mich App 323, 328; 489 NW2d 214 (1992). No-fault penalty interest is intended to penalize an insurer that is dilatory in paying a claim.
 
 Attard v Citizens Ins Co of America,
 
 237 Mich App 311, 319; 602 NW2d 633 (1999). This Court reviews for clear error a trial court’s finding whether a communication qualifies as reasonable proof of the fact or amount of a claim.
 
 Sharp, supra
 
 at 516-517.
 

 The pip benefits that formed the basis of the trial court’s award of penalty interest stemmed from medical services that plaintiff received while at mfbh. The billing documents within the record indicate that plaintiff received services at mfbh from July 1996 through late November 1996.
 

 The trial court determined that interest under MCL 500.3142(2) began to accrue on August 17, 1997. On July 17, 1997, plaintiff mailed defendant a letter and a statement he had received from mfbh. Although the lower court record does not contain a copy of the statement, defense counsel acknowledged at the June 3, 1999, hearing concerning the interest issue that the mfbh statement accompanying plaintiff’s July 17, 1997, letter reflected that bcbsm had paid approximately $117,000 charged by mfbh, leaving an outstanding balance of $6,736.25. At the interest hearing, plaintiff’s counsel explained that his July 17 letter requested that defendant pay only $6,736.25 because plaintiff
 
 *266
 
 then did not know that defendant’s policy with plaintiff provided for uncoordinated benefits.
 

 Defendant asserts that it had no obligation to pay for any medical services charged by mfbh until plaintiff provided defendant specific proof of the exact and correct amounts that defendant was obligated to pay. Defendant suggests that no such specific proof arrived until plaintiff mailed it a November 2, 1998, letter and over twenty pages of BCBSM explanation of benefits forms, indicating that bcbsm had paid mfbh approximately sixty percent of $147,000.
 
 [5]
 

 Defendant does not dispute its awareness of the fact of plaintiff’s loss, specifically that from July through November 1996 plaintiff incurred various medical expenses at mfbh. Furthermore, it appears undisputed that plaintiff’s July 17, 1997, letter reflected that the mfbh bill for the services it provided totaled approximately $124,000, roughly $117,000 paid by bcbsm and $6,736.25 to be paid by defendant. Defendant, the author of its policy with plaintiff, presumably was aware at the time it received plaintiff’s
 
 *267
 
 July 17 letter that it had to pay plaintiff uncoordinated benefits, duplicating those paid by BCBSM, and has not challenged during this litigation its obligation to pay uncoordinated benefits. Under these circumstances, we cannot conclude that the trial court clearly erred in finding that plaintiff’s July 17, 1997, letter and the accompanying statement from mfbh constituted “reasonable proof of the fact and of the amount of loss sustained” as contemplated by MCL 500.3142(2). See
 
 Sharp, supra
 
 at 516-517.
 

 We reject defendant’s suggestion that it need not have paid plaintiff any benefits until plaintiff requested the exact amount of money that defendant owed. The statute requires only
 
 reasonable
 
 proof of the amount of loss, not exact proof. MCL 500.3142(2). Once plaintiff armed defendant with the information from mfbh containing a total amount billed and an amount paid by BCBSM, defendant, if it had desired to challenge or investigate the amount purportedly paid by bcbsm, could have and should have conducted some investigation of its own during the thirty-day legislative grace period to establish a lesser amount of uncoordinated benefits owed. Our adoption of defendant’s proposed interpretation of MCL 500.3142(2) would contravene the purpose of the no-fault act to provide accident victims with assured, adequate, and prompt reparations by permitting an insurer to ignore definite but inexact claims. See
 
 Celina Mut Ins, supra
 
 at 89. Accordingly, we affirm the trial court’s imposition of no-fault penalty interest.
 

 IV
 

 We lastly address plaintiff’s argument on cross appeal that the trial court incorrectly calculated the
 
 *268
 
 amount of uncoordinated medical benefits that defendant had to pay by ignoring the full amounts mfbh charged for plaintiffs medical services and instead limiting defendant’s liability to the lesser amounts that mfbh accepted as payment in full for these services from BCBSM.
 

 In
 
 Bombalski v Auto Club Ins Ass’n,
 
 247 Mich App 536; 637 NW2d 251 (2001), this Court recently decided the exact issue that plaintiff raises. As in this case, the plaintiff in
 
 Bombalski
 
 was eligible to receive uncoordinated payments of his medical benefits by his no-fault insurer. The defendant no-fault insurer acknowledged the plaintiff’s entitlement to uncoordinated pip benefits for his medical expenses in addition to the medical care coverage he had received from BCBSM, his health insurer, but suggested that the amount that plaintiff could receive in uncoordinated benefits was limited to the amounts that his health care providers had accepted from bcbsm as payment in full for the health care services they provided.
 
 Id.
 
 at 539. This Court held that under MCL 500.3107(l)(a) the plaintiff could recover no-fault benefits only to the extent that he had
 
 incurred
 
 charges for reasonably necessary services:
 

 This Court in
 
 Shanafelt [v Allstate Ins Co,
 
 217 Mich App 625, 636-638; 552 NW2d 671 (1996)], addressed the defendant’s arguments that certain medical expenses were never incurred as contemplated by subsection 3107(l)(a). The Court noted that
 
 Random House Webster’s College Dictionary
 
 (1995) defined “incur” as “ ‘to become liable for.’ ”
 
 Shanafelt, supra
 
 at 638. See also Black’s Law Dictionary (7th ed), p 771, which similarly defines “incur” as “[t]o suffer or bring on oneself (a liability or expense).” The Court rejected the defendant’s suggestion that the plaintiff never incurred medical expenses because the plaintiff’s health insurer directly paid her medical bills.
 
 Shanafelt, supra
 
 at
 
 *269
 
 636-637. After quoting the dictionary definition of incur . . . the Court reasoned that “[ojbviously, plaintiff became liable for her medical expenses when she accepted medical treatment.”
 
 Id.
 
 at 638.
 

 Plaintiff submits that he likewise became liable for the amounts charged by his health care providers when he accepted their services and that consequently he incurred the full amounts charged. Plaintiff’s claim does not persuade us, however, because plaintiff overlooks the significance of “liable,” which means “[Responsible or answerable in law; legally obligated.” Black’s Law Dictionary,
 
 supra
 
 at 927. The satisfaction of plaintiff’s medical bills by bcbsm through payment of less than the amounts charged by the providers relieved plaintiff of any responsibility or legal obligation to pay the providers further amounts exceeding those proffered by bcbsm and accepted by plaintiff’s health care providers. Because plaintiff bears no liability for the full medical service amounts initially charged by his health care providers, he has not
 
 incurred
 
 these full charges.
 
 [Bombalski, supra
 
 at 542-543 (emphasis in original).]
 

 In this case, plaintiff seems to acknowledge that he owes no outstanding amounts to mfbh for the services it provided and that, pursuant to its contractual agreement with bcbsm, mfbh accepted the reimbursement amounts that bcbsm offered as payment in full for the services that mfbh provided. Consequently, plaintiff did not incur the full amounts billed by mfbh and is not entitled to a further recovery from defendant of the difference between the full amounts that mfbh billed for its services and the lesser amounts that mfbh accepted from BCBSM as payment in full.
 
 Bombalski, supra
 
 at 543. We conclude that the trial court properly calculated the amount of uncoordinated no-fault benefits to which plaintiff was entitled.
 

 Affirmed.
 

 [1]
 

 Bcbsm apparently paid many of plaintiffs medical bills despite that its policy with plaintiff provided that his no-fault carrier had primary responsibility for automobile-related injuries.
 

 [2]
 

 We note that the record contains no indication whatsoever exactly how much money defendant might save by pursuing its proposed course of action. At the time of the oral arguments in this case, defendant apparently had not yet purchased or begun altering an appropriate house.
 

 [3]
 

 We do not disagree with the trial court’s suggestion that were plaintiff unwilling to sell his current house and contribute his equity toward the purchase and renovation of a ranch house, it might be unreasonable to demand that defendant provide plaintiff legal title to the alternate living space.
 

 [4]
 

 We note briefly our rejection of defendant’s further characterizations of the trial court’s ruling as unfair. Defendant views as unfair the fact that the “trial court’s ruling ... will result in all manner of anomalous and arbitrary results all based on the fortuity of the amount of equity that a given
 
 *264
 
 insured would have in his or her home.” We fail to comprehend, however, what arbitrary results defendant imagines. An insurer’s payment of different amounts in each case for an insured’s reasonably necessary alternate accommodations according to the amount of the insured’s existing equity does not appear arbitrary but measured by a specific, easily ascertainable amount, namely, the insured’s existing equity. To the extent that defendant suggests that adhering to the trial court’s logic will require insurers “to purchase or construct a home for the benefit of” “those insureds who do not own homes at the time of their motor vehicle accidents,” we find it plain that our affirmance of the trial court’s decision would not necessarily signify that under MCL 500.3107(l)(a) an insurer would be required to build or purchase and renovate a house and give title to the insured whenever any insured required special long-term accommodations because of a motor vehicle accident. In different cases involving insureds who had not owned a house before the accident or who did own a house before the accident but did not wish to give up ownership of their existing house, different results plainly would obtain according to what constituted reasonable charges in those cases. We repeat that in this case the parties do not dispute that defendant’s preparation of a house to accommodate plaintiff’s postaccident medical conditions constitutes an appropriate, reasonably necessary expense under MCL 500.3107(lXa), and defendant does not appear to challenge the reasonableness of plaintiff’s desire to retain ownership of a house.
 

 In light of our conclusion, we need not address plaintiff’s argument on cross appeal that “[i]n the event that this Court should overturn the Trial Court’s decision with regard to legal title of a new home, it is essential that Plaintiff’s right to a reasonably necessary renovation at his original home ... be determined as an allowable expense under the No-Fault Act.”
 

 [5]
 

 Plaintiffs November 2 letter stated that “even though Mary Free Bed may show that Blue Cross/Blue Shield paid $147,000, in actuality they only paid about 60% of that.”
 

 Plaintiff sent two other letters mentioning the mfbh charges. On October 22, 1997, plaintiff mailed defendant a letter expressing his understanding that his policy with defendant entitled him to receive uncoordinated no-fault benefits. Plaintiff indicated that he would “begin conducting an audit of all medical expenses incurred . . . since [the] accident,” which he believed that defendant likewise would accomplish, but that his “limited records show that Blue Cross paid at least $117,000 to Mary Free Bed (see attached statement) and I suspect that Blue Cross has probably paid in total twice that amount.”
 

 On May 7, 1998, plaintiff mailed defendant another letter reiterating his understanding that defendant would pay him uncoordinated medical benefits. This letter stated that according to mfbh billing records, bcbsm had paid $144,994.61 ($27,508.34 for services plaintiff received from July 5 through July 24, 1996, and $117,486.27 for services plaintiff received from July 26 through November 6, 1996).