# STATE OF MICHIGAN

# COURT OF APPEALS

LOIS WINEGAR Personal Representative for the
ESTATE OF GEORGE WINEGAR,

UNPUBLISHED
April 28, 2016

Plaintiff-Appellee,

v

No. 325601
Livingston Circuit Court
LC No. 13-027746-NF

FARM BUREAU INSURANCE COMPANY,

Defendant-Appellant.

Before: TALBOT, C.J., and HOEKSTRA and SHAPIRO, JJ.

PER CURIAM.

Plaintiff estate, through its personal representative, Lois Winegar, submitted a claim for no-fault insurance survivor benefits following the death of Lois's husband, George Winegar. Defendant, George's no-fault insurer, denied the claim and plaintiff filed suit. The matter was tried. The trial court denied defendant's motions for directed verdict and the jury found for plaintiff, awarding the sought benefits and no-fault penalty interest. The trial court thereafter granted plaintiff's motion for no-fault attorney fees pursuant to MCL 500.3148(1). We affirm the judgment in all respects except the amount of penalty interest as to which we remand.

## I. PROCEDURAL AND FACTUAL HISTORY

The facts preceding the claim event are undisputed. George Winegar, the insured decedent, spent the afternoon of April 16, 2013 helping his son, Brian, with chores on the family's farm. Brian testified that before George left the farm, they loaded a large trash can filled with old burn barrels into the bed of the pickup truck owned by George and insured by defendant. George and Lois's neighbor, Ken Fleeger, testified that he saw George arrive home in his pickup truck, park in his driveway, enter the bed of the truck, and roll the trash can to the truck's tailgate in order to unload it. Fleeger testified that once the trash can's wheels left the tailgate, George, who was holding onto the trash can, was catapulted over the side of the truck, striking the driveway. Fleeger and another man ran to George and called 911. First responders testified that when they arrived George was unconscious and they gave him CPR because they believed that he was in full cardiac arrest.

George was transported to the hospital, where he was examined and treated by Dr. Venkatesh Murthy, a cardiologist. Dr. Murthy testified that George had suffered a cardiac arrest, but based on test results, he had concluded that the primary cause of George's condition was not

cardiovascular in origin. He recommended that he be consulted for further tests if George survived his other injuries, which included multiple fractures to the cervical vertebrae in the neck. George was placed in a medically-induced coma, and after he experienced brain seizures, the family removed him from life support machines. George died on April 20, 2013.

Assisted by her daughter, Kathleen Branch Nelson, Lois contacted defendant in order to initiate a claim for survivor benefits. A series of emails between Kathleen and Jodi Treat, defendant's claim representative followed. On May 6, 2013, Kathleen submitted copies of the funeral bills paid by the family. On May 7, 2013, Kathleen requested a claim form and general information about how to provide information concerning lost income. Treat wrote back explaining how such benefits are calculated. She stated that if coverage applied, defendant would owe plaintiff lost wages if George was still working, the difference between retirement and social security benefits before and after the death, and up to $20 per day for replacement services. She went on to explain that plaintiff "should receive a statement from both the retirement and SS, of what her new benefit will be. I would need a copy of what [George] was getting prior his death and what [plaintiff] is receiving now. That is the income benefit of the Survivor Benefit." As to replacement services, Treat explained that plaintiff would "need to indicate any household services [George] was responsible for around the house (cooking, cleaning, trash, etc., how many days he was responsible for household chores and we can reimburse . . . up to $20/day."

On May 10, 2013, Kathleen sent an email to Treat stating that information regarding her father's retirement and social security would take 6-8 weeks to obtain and that the information regarding lost income from work would also be forthcoming after it was obtained. Lois submitted the completed written claim form on May 25, 2013. The claim form did not provide additional information regarding amounts of the claimed loss, but included an executed release for medical records. Later, defendant received the death certificate, police report, and medical reports. Defendant also received information through its own private investigator.

On July 3, 2013, defendant sent a letter to Lois denying the claim. The letter stated that "it does not appear that [George's] death was caused by the use of a motor vehicle as a motor vehicle. As noted on the death certificate, [George] suffered sudden cardiac death due to atherosclerotic cardiovascular disease, natural causes."

Plaintiff thereafter filed suit seeking the claimed no-fault survivor benefits asserting that George's death arose out of unloading a parked vehicle. See MCL 500.3106(1)(b). Defendant served interrogatories on plaintiff. Plaintiff's answers to those interrogatories, signed on February 27, 2014 and received by defendant, were admitted as an exhibit at trial. In response to the interrogatories about the loss of George's wages and retirement benefits, plaintiff stated in her answers that there were two sources of wage losses: first, the loss of George's income from Coral Line for whom he worked from 1997 until his death, and second, a reduction in his pension benefits from OPM where George had previously worked. The interrogatory answer read:

> George was employed as a contractor by Coral Line (Egernsund Denmark)
> from Jan 1, 1997 until his death as their North American Representative. He

received a monthly retainer of $1000 and .3% of the gross freight for all voyages to/from and within North America. See tax returns attached.

He received a federal pension/annuity from OPM for his years of federal service. At the time of his death, his net monthly income (after federal taxes and health insurance) was $4,668.90. The reduced benefit that Lois now receives since George's death is $3118.60. This information is on the attached tax returns.

Along with these answers, plaintiff provided executed releases allowing defendant to receive George's employment records and his federal and Michigan tax records. Plaintiff's answers also stated that George had been receiving social security benefits and provided a signed release to allow defendant to obtain the records from the social security administration. Plaintiff's response to the interrogatories, however, did not provide any specific information as to replacement services.

Lois was deposed on March 14, 2014. During her deposition she confirmed, under oath, that George's death had resulted in a reduction of pension benefits to the household from $4,668.90 to $3,118.60 and a cessation of income from Coral Line.

At trial, there was conflicting testimony concerning the mechanism of George's death. Dr. Murthy was called as a witness by plaintiff. He treated George from his arrival at the hospital until his death. Dr. Murthy testified that in his opinion, based on a reasonable degree of medical certainty, "the primary inciting factor that led to me seeing Mr. Winegar was not cardiovascular in nature, and that his cardiovascular issues, specifically his multiple arrests, were likely a consequence rather than a trigger" of his fall from the truck. He reviewed the evidence of George's skull and cervical spine injuries caused by the fall from the truck and opined that the cause of death was "trauma leading to cardiac arrest."

Defendant called two physicians as witnesses: Dr. Jentzen, the pathologist who signed the death certificate, and Dr. Kahn, a cardiologist retained as an expert by defendant. Dr. Jentzen testified that no autopsy was performed and that neither himself nor the original pathologist who had charge of the case actually examined the body. Dr. Jentzen testified that, after reviewing the medical records, it was his opinion that George died from a sudden cardiac arrest resulting from underlying cardiovascular disease. On cross-examination, Dr. Jentzen conceded that if there was evidence that George had not simply collapsed, but had instead been catapulted out of the truck bed onto his head, that such evidence might lead him to change his opinion, and he agreed that such an event could cause a cardiac arrest.

Dr. Kahn testified that, in his view, it was unlikely that George was thrown from the truck because of the trash can and he said he would discount the testimony of the eyewitness because he was a layperson. He noted that at the time of the event, George "was exerting himself physically with something that's been described as potentially heavy." He testified that it was his "opinion to within a reasonable degree of medical certainty that when he was exerting himself that day that he experienced ischemia, lack of oxygen, inadequate function of the heart and it triggered one of the rhythm problems that can cause you to suddenly collapse and lose function, pulseless electrical activity." He testified "in my opinion he had a cardiac arrest while exerting in the truck." When asked by defense counsel whether it was his opinion that the

cardiac arrest would have happened regardless of what Mr. Winegar was doing at the time, Dr. Kahn answered, "No, that's not been my opinion. . . . I think it's medically probable that his cardiac arrest was brought on by exertion."

As to economic losses, plaintiff relied largely on the testimony of Gregory Clumb, who had been George's accountant for several years. Clumb testified as to the reduction in pension benefits and post-retirement employment income to George's wife as a result of his death. His calculations regarding pension and social security losses were based on the change in benefits following George's death as shown in the social security, tax, and pension records, all of which had been provided to defendant in February 2014. As to losses from continued post-retirement employment, Clumb accepted the figure of his net employment income shown on George's last full year tax return, which had also been provided to defendant in February 2014.

Testimony as to replacement services was offered by family members who testified as to the household tasks that George performed. George's son testified that he had performed various chores for plaintiff since his father's death, visiting his mother twice a week, and that he had two other siblings who visited about once a month to help plaintiff. George's daughter testified that since her father's death she had been helping her mother manage her finances.

At the close of plaintiff's proofs, defendant moved for a directed verdict as to coverage and certain benefits. As to the former, defendant argued that plaintiff had failed to produce evidence that George's death arose out of the loading or unloading of a parked vehicle used as a motor vehicle. As to the latter, defendant argued that no proofs had been offered as to replacement services. The trial court denied both motions, finding that such evidence had been presented. During trial, defendant also asked the court to give five special jury instructions as to no-fault law and burden of proof. The trial court declined to give defendant's special instructions, and instead, the court gave the standard instruction, M Civ JI 35.02. The trial court added an instruction advising the jury that plaintiff could not met her burden if she merely proved that George died while unloading the truck and that plaintiff had to prove that the death arose out of the unloading.

The jury found for plaintiff and awarded $59,631.63 for loss of tangible things of economic value and $5,750 in replacement services. The jury also found that benefits were overdue and awarded $7,845.80 in penalty interest.

Plaintiff later brought a motion seeking no-fault attorney fees under MCL 500.3148(1) and defendant filed a motion for judgment notwithstanding the verdict (JNOV). The trial court denied defendant's motion for JNOV, concluding that there was sufficient evidence to uphold the jury verdict with respect to its award of expenses for replacement services and penalty interest. The trial court granted plaintiff's motion for no-fault attorney fees, finding that defendant's denial of benefits had been unreasonable. From these rulings, defendant appealed.

II. DEFENDANT'S MOTIONS AS TO COVERAGE

Defendant argues that the trial court erred in denying its motion for directed verdict and JNOV because, the jury could not have lawfully concluded that George's injuries fell within the scope of the MCL 500.3105[1] or one of the exceptions to the parked motor vehicle exclusion under MCL 500.3106(1). "In reviewing the trial court's decision, we view the evidence presented up to the time of the motion in the light most favorable to the nonmoving party, granting that party every reasonable inference, and resolving any conflict in the evidence in that party's favor to decide whether a question of fact existed." *Derbabian v S & C Snowplowing, Inc*, 249 Mich App 695, 701-702; 644 NW2d 779 (2002). Thus, in considering defendant's challenge to the verdict, we consider all evidence in the light most favorable to plaintiff.

Defendant offered no evidence that George was not unloading his parked truck at the relevant time. Defendant argues, however, that (1) there was no evidence that George's death was caused by his fall from the truck; (2) the truck was not being used as a motor vehicle; and (3) the cardiac arrest was unrelated to the unloading process.

The first of these claims is readily dispensed with. An eyewitness testified that George was catapulted out of the truck bed as he attempted to unload a heavy trash can from the truck. Moreover, the doctor who treated George at the hospital testified that the cause of the cardiac arrest was the trauma from the fall from the truck. Defendant disputed this evidence, but whether or not to accept it is a matter left for the jury. See *Shuler v Mich Physicians Mut Liability Co*, 260 Mich App 492, 519; 679 NW2d 106 (2004) (noting that conflicts in the evidence should be resolved by the jury).

Defendant's argument that the truck was not being used as a motor vehicle is also without merit. It was undisputed at trial that George loaded his truck with trash cans in order to transport them, that he drove the truck to a second location, and that he parked and began to unload the trash cans. "[A] vehicle need not be in motion at the time of an injury in order for the injury to 'arise out of the use of a motor vehicle as a motor vehicle,' " but "the phrase 'as a motor vehicle' does require a general determination of whether the vehicle in question was being used, maintained, or operated for transportational purposes[.]" *Drake v Citizens Ins Co of America*, 270 Mich App 22, 26; 715 NW2d 387 (2006) (citation omitted). Moreover, defendant's position is contrary to the plain terms of MCL 500.3106(1)(b), which defines the scope of coverage in the context of the unloading a transporting vehicle after it has been parked and provides that as a matter of law, accidental bodily injury arises out of use of parked vehicle when "the injury was a direct result of physical contact with . . . property being lifted onto or lowered from the vehicle in the loading or unloading process."

The facts of this case are wholly consistent with our application of this statute in prior cases. For example, in *Drake*, the plaintiff's injury occurred while assisting another person in unclogging an animal feed delivery truck's auger system; the plaintiff reached through an inspection door to clear the augers, and the other person activated the system. *Drake*, 270 Mich App at 24. The *Drake* Court reasoned that "[t]he vehicle involved is a delivery truck, and it was

---

[1] MCL 500.3105(1) states: "Under personal protection insurance an insurer is liable to pay benefits for accidental bodily injury arising out of the ownership, operation, maintenance or use of a motor vehicle as a motor vehicle, subject to the provisions of this chapter."

being used as such when the injury occurred." *Id*. at 26. See also, *Adanalic v Harco Nat'l Ins Co*, 309 Mich App 173, 177-178, 182-183; 870 NW2d 731 (2015) (holding that the plaintiff's claim fell under MCL 500.3106(1)(b) when he was injured while loading pallets onto his truck).

Additionally, George's use of his truck in this case stands in stark contrast to the rare circumstances "when a motor vehicle is used for other purposes, e.g., as a housing facility of sorts, as an advertising display (such as at a car dealership), as a foundation for construction equipment, as a mobile public library, or perhaps even when a car is on display in a museum. On those occasions, the use of the motor vehicle would not be 'as a motor vehicle,' but as a housing facility, advertising display, construction equipment base, public library, or museum display, as it were." *McKenzie v Auto Club Ins Ass'n*, 458 Mich 214, 219; 580 NW2d 424 (1998).

This case is also readily distinguishable from this Court's decision in *Rice v Auto Club Ins Ass'n*, 252 Mich App 25; 651 NW2d 188 (2002). In that case, the plaintiff, a fuel truck driver for Ford Motor Company, parked his fuel truck, left the vehicle, and set a ladder against a nearby steel hauler[2] he was going to refuel. He then turned on the fuel truck's fuel pump, extended the hose from the fuel truck, and ascended the ladder on the hauler so he could begin the refueling process. *Id*. at 27. While he was still on the ladder, the steel hauler (not the fuel truck) moved, dislodging the ladder and the plaintiff fell, sustaining serious injuries. *Id*. at 28. He claimed no-fault benefits from the insurer of his private vehicle, claiming that he was "unloading" fuel from the parked fuel truck. The trial court granted judgment in the plaintiff's favor after concluding that the parked vehicle exception in MCL 500.3106(1)(b) applied. *Id*. at 29-30. This Court reversed, holding that "the problem in this case is that at the time [the plaintiff] sustained his injuries, he had virtually no physical or practical connection to the fueling truck." *Id*. at 37. Instead, he was "standing on a ladder" leaning against the steel hauler and the steel hauler "not the fuel truck, moved, causing him to fall." *Id*. Moreover, there was nothing about the unloading process from a motor vehicle that caused his injury. It was the process of loading the fuel into the hauler, a non-motor-vehicle, climbing a ladder unconnected to the truck and the movement of an object unconnected to the truck that caused the injury. In contrast to the plaintiff in *Rice*, George was actively removing a load from his pickup truck and was in direct contact with the pickup truck when the injury-causing event occurred.

Defendant's third argument, i.e., that the cardiac arrest was unrelated to the unloading process, fails for two reasons. First, it only arises if the jury rejected the testimony of the eyewitness and Dr. Murthy regarding the events and cause of death. And as noted, defendant has offered no basis for its argument that the jury did so, or was required to do so. Second, even assuming the jury fully accepted Dr. Kahn's theory, it could readily have found no-fault coverage given Dr. Kahn's testimony about what caused George's cardiac arrest. As noted earlier, Dr. Kahn repeatedly testified that George's cardiac arrest occurred because he was overexerting himself in order to unload the trash cans from the truck. Where a heart attack occurs due to the exertion of unloading a vehicle and there are proofs of its causal link to that unloading exertion, a jury may properly conclude that it was an accidental bodily injury. *McKim*

---

[2] It was undisputed that the steel hauler was not being used as a motor vehicle within the meaning of the no-fault act; hence, the steel hauler could not be the basis for the payment of no-fault benefits. *Rice*, 252 Mich App at 37-38.

*v Home Ins Co*, 133 Mich App 694, 697-699; 349 NW2d 533 (1984), lv den 422 Mich 853 (1985). Moreover, unlike *McKim*, in this case, even *defendant's expert* testified that the cardiac event occurred during the unloading process and was triggered by the exertion required by that process.

## III. JURY INSTRUCTIONS

Next, defendant claims reversible error in relation to the court's decision not to give one of five requested special jury instructions. After review of the record, we discern no error. The trial court gave the standard jury instruction, M Civ JI 35.02, which accurately described the law governing no-fault personal protection insurance (PIP) benefits, the elements that had to be proven, and the fact that the burden of proof was on plaintiff. The court instructed the jury as follows:

> In order for the plaintiff to recover no fault benefits from the defendant, the plaintiff has the burden of proof on each of the following. One, that at the time of the accident there existed a valid contract of no fault insurance between George Winegar and defendant. Two, that George Winegar was loading or unloading the vehicle. Three, that George Winegar's death arose out of the use of a motor vehicle as a motor vehicle. Four, that following the death of George Winegar dependents of George Winegar during the first three years after the date of the accident . . . sustained a loss of contribution of tangible things of economic value, no including services that the dependents would have received for their support during their dependency if George Winegar had not died. Five, that following the death of George Winegar dependents of George during the first three years after the date of the accident reasonably incurred expenses during their dependency, and after the date George Winegar died, and obtaining ordinary and necessary expenses in place of those that the decedent would have performed for the benefit of the dependents that the defendant failed to pay any or all of said benefits.

> To the extent that plaintiff has met or has not met her burden of proof, you may grant diminished or [deny] claimed benefits . . . .

Defendant did not object to this instruction. On appeal, however, defendant asserts that the instruction failed to inform jurors that even if George was unloading the truck, plaintiff still had to demonstrate that the injury arose out of the use of a motor vehicle as a motor vehicle. Defendant is mistaken because the instruction given by the court said exactly that. Specifically, the second requirement set forth in the instruction was "that George Winegar was loading or unloading the vehicle" and the third requirement was "that George Winegar's death arose out of the use of a motor vehicle as a motor vehicle." Defendant's claim is therefore without basis.

Defendant also contends that the trial court erred by adding additional language to the standard instruction. We disagree. First, it is unclear whether defendant even objected to this language on its own terms or simply restated its request that its proposed instructions be given. Defense counsel never indicated that defendant would prefer that the standard instruction be read without the additional text written by the court; only that defendant wanted the standard instruction plus the additions it was proposing. Second, a review of the record leaves little doubt

that the trial court only drafted the additional language in an attempt to address the concerns of the defense and that, had defense counsel indicated a preference for the standard instruction alone, the court would have agreed.

In any event, the additional text prepared by the court and read along with the standard no-fault burden of proof instruction was not erroneous. Indeed, it emphasized the very point argued by defendant. The court advised that "loading or unloading a motor vehicle is considered use," but went on to advise the jury that "[y]our inquiry is not limited to whether [George] was loading or unloading his motor vehicle. You must consider whether the accidental bodily injury arose out of the loading or unloading of the motor vehicle." In other words, the jury could not find for plaintiff simply because George coincidentally happened to have a heart attack at the time of unloading. The jury could only find for plaintiff if it found that the heart attack arose out of the unloading.

> On appeal, jury instructions are reviewed in their entirety, rather than extracted piecemeal to establish error in isolated portions. There is no error requiring reversal, if on balance, the theories of the parties and the applicable law were fairly and adequately presented to the jury. The trial court's decision regarding supplemental instructions will not be reversed unless failure to vacate the verdict would be inconsistent with substantial justice. [*Mull v Equitable Life Assurance Society of United States*, 196 Mich App 411, 423; 493 NW2d 447 (1992) (citations omitted).]

We find no instructional error. Moreover, because the trial court's view of the disputed issues in this case was correct and its instruction did not affect the jury's determination of those issues, if there was any instructional error it did not result in a verdict "inconsistent with substantial justice." *Id.*

## III. EXPENSES FOR REPLACEMENT SERVICES

Defendant next argues that the trial court erred in denying its motion for JNOV on the issue of expenses for replacement services. "This Court reviews de novo the trial court's decision to grant JNOV[.]" *Nelson v Dubose*, 291 Mich App 496, 499; 806 NW2d 333 (2011). Further,

> . . . this Court should examine the testimony and all legitimate inferences therefrom in the light most favorable to the plaintiff. A trial court should grant a motion for JNOV only when there was insufficient evidence presented to create an issue for the jury. Thus, a trial court should grant a party's motion for JNOV with respect to certain damages if the jury was permitted to speculate concerning the amount of those damages. . . . [A] case should not be submitted to the jury where a verdict must rest upon conjecture or guess. [*Attard v Citizens Ins Co of America*, 237 Mich App 311, 321; 602 NW2d 633 (1999) (citations and quotations omitted).]

The survivors' loss statute governs replacement services benefits. It states that such benefits consists of "expenses, not exceeding $20.00 per day, reasonably incurred by these

dependents during their dependency and after the date on which the deceased died in obtaining ordinary and necessary services in lieu of those that the deceased would have performed for their benefit if the deceased had not suffered the injury causing death." MCL 500.3108(1).

Brian Winegar testified that since his father's death, he came to his mother's home twice per week to perform various chores for her that his father would otherwise have performed. In addition, Kathleen Nelson testified that since her father's death she had handled the bulk of plaintiff's financial matters, and she provided the specific number of days that she had done so. The quality and type of services provided to plaintiff were the type contemplated as "ordinary and necessary services." See *Fortier v Aetna Casualty & Surety Co*, 131 Mich App 784, 793; 346 NW2d 874 (1984). Further, formal billing is not required. *Douglas v Allstate Ins Co*, 492 Mich 241, 267 n 56; 821 NW2d 472 (2012). The lack of formal documentation regarding when the services took place does not entitle defendant to relief because the witnesses' testimony was specific regarding the number of days that they had provided services, and their credibility was a matter for the jury. See *Frontier*, 131 Mich App at 791-792.

Defendant's argument on appeal is mainly that, viewing the evidence in a light most favorable to plaintiff, there was nothing to establish that she "incurred" expenses for replacement services by becoming liable for them and that the family members performing the services were not simply donating their time. Although *Douglas* considered the issue of expenses of "charges incurred" under MCL 500.3107(1)(a), *Douglas*, 492 Mich at 266, and although MCL 500.3108(1) provides for expenses "reasonably incurred," we find instructive *Douglas's* holding that expenses may be "incurred" on the basis of an expectation that the *insurer* will provide payment. See *Douglas*, 492 Mich at 267 n 56. In that regard, Kathleen testified that she was approached about filing a claim under George's no-fault policy shortly after George's death, and communications between her and defendant's adjuster discussed that, assuming coverage, expenses for replacement services were reimbursable under the policy. Based on these communications, which were submitted to the jury, and observing the standard of review applicable to the trial court's denial of defendant's motion for JNOV, we conclude that there was sufficient evidence to support the jury's award of expenses for replacement services in favor of plaintiff.

## IV. PENALTY INTEREST AND ATTORNEY'S FEES

Defendant also challenges the trial court's denial of its motion for JNOV on the issue of penalty interest under MCL 500.3142 and the trial court's award of attorney's fees to plaintiff under MCL 500.3148(1).

We review de novo issues of statutory interpretation. *Moore v Secura Ins*, 482 Mich 507, 516; 759 NW2d 833 (2008). A trial court's decision whether to award attorney fees is reviewed for an abuse of discretion. *Id*. "This Court reviews for clear error a trial court's finding whether a communication qualifies as reasonable proof of the fact or amount of a claim." *Williams v AAA Mich*, 250 Mich App 249, 265; 646 NW2d 476 (2002).

MCL 500.3142(2) states:

(2) Personal protection insurance benefits are overdue if not paid within 30 days after an insurer receives reasonable proof of the fact and of the amount of loss sustained. If reasonable proof is not supplied as to the entire claim, the amount supported by reasonable proof is overdue if not paid within 30 days after the proof is received by the insurer. Any part of the remainder of the claim that is later supported by reasonable proof is overdue if not paid within 30 days after the proof is received by the insurer. . . .

"The aim of the no-fault act in general, and § 3142 specifically, is to promptly and adequately compensate persons who were injured in a motor vehicle mishap." *Nash v Detroit Auto Inter-Ins Exchange*, 120 Mich App 568, 572; 327 NW2d 521 (1982). MCL 500.3142 "only requires that the insured present the insurer with reasonable proof of loss. If the insurer does not pay the claim within 30 days after receiving this proof, it becomes liable for interest." *Fortier*, 131 Mich App at 793. "Penalty interest must be assessed against a no-fault insurer if the insurer refused to pay benefits and is later determined to be liable, irrespective of the insurer's good faith in not promptly paying the benefits." *Williams*, 250 Mich App at 265.

MCL 500.3142(2) contains two requirements: "reasonable proof of the fact that a loss was sustained . . ." and "the amount of the loss sustained." *Regents of Univ of Michigan v State Farm Mut Ins Co*, 250 Mich App 719, 734-736; 650 NW2d 129 (2002). It was plaintiff's burden as the claimant to supply reasonable proof of loss and reasonable proof of amount of loss. See *Moore*, 482 Mich at 523.

Defendant argues that, until trial, plaintiff did not submit reasonable proof of the amount of the loss sustained for lost income and replacement services. In *Moore*, the jury was instructed to "award interest for any pro rata portion for which plaintiff did supply reasonable proof." *Moore*, 482 Mich at 518. In light of the jury's calculation of the interest award, the *Moore* Court was able to discern a "logical explanation for the findings of the jury" and uphold the jury's verdict. *Id*. at 518-519 (citation and quotation marks omitted). Here, it is evident that the interest award was assessed on the entire amount of survivors' loss benefits because the award was 12% of the total amount of benefits that the jury found defendant liable for from the date of George's death to the time of trial.

Plaintiff provided reasonable proof as to loss of income benefits in its February 27, 2014 answer to interrogatories. Plaintiff's answers stated that the loss was the cessation of income from George's employment and the reduction in pension benefits from his prior employment. As to the former, plaintiff supplied the tax records which set forth George's employment income. As to the latter, plaintiff set forth the different amounts in her answer and executed the requested pension record. MCL 500.3142(2) only mandates that a plaintiff provide "reasonable proof" of the loss and the amount of loss. There is no requirement that a plaintiff must present *exact proof* of the amount of the loss sustained. *Williams*, 250 Mich App at 267.

Plaintiff did not, however, provide reasonable proofs as to replacement services until trial. The interrogatory answers as to those services stated "unknown at this time" and no supplement was ever provided.

The jury properly concluded that benefits for the losses in employment and pension income were overdue, but erroneously calculated them from the date of George's death and not the date of the interrogatory answers, which was when reasonable proof of the amount of loss was provided. Accordingly, we vacate the award of penalty interest as to replacement services. In addition, we remand with direction to the court to recalculate the penalty interest assessed as to the lost income benefits so as to award it only from the date of plaintiff's answers to interrogatories.

Defendant also argues that the trial court erred in awarding plaintiff attorney's fees under MCL 500.3148. MCL 500.3148(1) defines two prerequisites for the award of attorney fees. First, the benefits must be overdue, MCL 500.3148(1), meaning "not paid within 30 days after an insurer receives reasonable proof of the fact and of the amount of loss sustained," MCL 500.3142(2). Second, in post-judgment proceedings, the trial court must find that the insurer *"unreasonably refused to pay the claim* or *unreasonably delayed in making proper payment."* *Moore*, 482 Mich at 520 (emphasis in original).

As just discussed, the payment for lost wages and pension benefits were overdue, so that prerequisite was met. As to the second prerequisite, the trial court found that defendant unreasonably denied benefits.

After review of the record, we conclude that the trial court did not abuse its discretion in awarding attorney fees. Defendant denied the claim on the grounds that George's death was unrelated to his unloading of the truck. First, it rejected the contemporaneous and uncontradicted statements of the sole eyewitness who stated that George was thrown from the truck by the weight of the trash can and did not simply spontaneously collapse. Second, accepting defendant's version, i.e. that George was not thrown but suffered a cardiac arrest while on the truck bed, the denial was nevertheless unreasonable. Defendant argued to the jury that the fact that George was unloading his parked vehicle was simply a coincidence and was not a cause of his death. However, defendant's own expert testified that the cardiac arrest occurred because of the exertion of unloading. Regardless of which version of events was accurate, i.e., plaintiff's theory that George died because the weight of the trash can caused him to fall or defendant's theory that George died because he had a cardiac arrest caused by exertion from moving the trash can, it is clear that the only two versions for which there was any evidence each mandated coverage. Accordingly, on this record, the trial court did not abuse its discretion in finding that the denial was unreasonable.

## V. CONCLUSION

We affirm the jury's verdict that defendant was liable for survivors' loss benefits and hold that defendant is not entitled to a new trial on the grounds of instructional error. We also affirm the jury's award of expenses for replacement services from the date of death to trial, and the trial court's decision to award plaintiff attorney fees. With regard to the award of penalty interest, we vacate the trial court's award of penalty interest as to replacement services, and we reverse in part the award of penalty interest as to lost income benefits insofar as it was calculated from the time of George's death, rather than from the time plaintiff presented reasonable proof of the loss and the amount of loss sustained. We remand for the limited purpose of recalculating the amount of penalty interest to be assessed. The trial court shall award penalty interest from

-11-

the date that plaintiff submitted her interrogatory answers to defendant for the loss of income benefits.  We do not retain jurisdiction.

/s/ Michael J. Talbot
/s/ Joel P. Hoekstra
/s/ Douglas B. Shapiro