# STATE OF MICHIGAN

# COURT OF APPEALS

RIVERVIEW MACOMB HOME AND
ATTENDANT CARE, LLC, d/b/a AVA CARE
AND CASE MANAGEMENT,

UNPUBLISHED
October 20, 2016

Plaintiff-Appellee,

v

No. 327030
Macomb Circuit Court
LC No. 2013-002361-NF

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY,

Defendant-Appellant/Cross-
Appellee,

and

GROUP 1 HOME, INC,

Intervening Plaintiff-
Appellee/Cross-Appellant,

and

MENDELSON ORTHOPEDICS, PC, and
SYNERGY SPINE AND ORTHOPEDIC
CENTER,

Intervening Plaintiffs-Appellees.

Before: GADOLA, P.J., and BORRELLO and STEPHENS, JJ.

PER CURIAM.

Defendant, State Farm Mutual Automobile Insurance Company (State Farm), appeals by right a January 27, 2015, trial court judgement entered following a jury verdict awarding intervening plaintiff-cross-appellant, Group 1 Home, Inc (Group 1), no-fault benefits for services provided to Dan Richardson, a pedestrian who suffered severe injuries in an automobile accident. Group 1 Home cross-appeals the trial court's order precluding it from recovering benefits for services rendered before the appointment of Richardson's guardian. For the reasons set forth in

-1-

this opinion, we vacate the judgment in favor of Group 1 Home, affirm the trial court's order denying benefits before appointment of the guardian, and remand for entry of an order granting summary disposition in favor of defendant as to Group 1's claims.

## I. FACTUAL BACKGROUND

Richardson, a pedestrian, was struck by an automobile and sustained serious injuries, including a traumatic brain injury. Because Richardson was not covered by any no-fault policy, his claim was assigned to defendant through the Michigan Assigned Claims Facility. Richardson's physicians prescribed 24-hour daily attendant care services for Richardson. Plaintiff Riverview Macomb Home and Attendant Care, d/b/a Ava Care and Case Management ("Ava"), provided case management services for Richardson. Before the accident, Richardson rented a room in a basement. After the accident, Richardson could not access the basement room because of his injuries and he therefore was homeless. Ava arranged for Richardson to enter Group 1 Home, Inc., a residence facility where Richardson could have access to attendant care services. Defendant denied payment of no-fault personal injury protection ("PIP") benefits, including attendant care benefits, to Group 1 Home pursuant to MCL 500.3157, on the ground that it was not a licensed adult foster care facility, and thus did not lawfully render treatment. Ava brought this action against defendant for payment of attendant care and other benefits. Group 1 Home was permitted to intervene to pursue its claim for payment of attendant care benefits.

Defendant moved for summary disposition under MCR 2.116(C)(10), arguing that there was no genuine issue of fact that the services Richardson received from Group 1 Home were in the nature of adult foster care, which Group 1 Home was not licensed to provide.

Ava argued in response that Group 1 Home's services were not adult foster care services because Group 1 Home did not provide protection to Richardson within the meaning of the adult foster care licensing act. Ava argued that it did not manage Richardson's finances or screen visitors. Richardson was free to leave at any time. Group 1 Home did not provide any protection other than a business's ordinary duties to customers. Ava stated that Richardson had a guardian to oversee his protection. Ava denied that Group 1 Home's services met the definition of foster care under MCL 400.704(7). Ava pointed out that it subcontracted with Group 1 Home to provide attendant care. The contract did not refer to foster care.

Group 1 Home asserted in its response that it was not an adult foster care facility within the meaning of the adult foster care facility licensing act. Group 1 Home denied that it was acting as Richardson's guardian or fiduciary. It denied that it was billing defendant for foster care services. It stated, "Group 1 Home simply provided a place to stay and 24-hours per day of attendant care, as prescribed by his physician." Group 1 Home denied that it required a foster care license to receive payment for attendant care services under the no-fault act.

Defense counsel argued at the motion hearing that Group 1 Home was rendering adult foster care services within the meaning of the statute. She emphasized that Allen testified in his deposition "that the rate of pay that he was charging included room and board and he monitored Mr. Richardson for his safety." Counsel for Group 1 Home argued in response that defendant was "welcome to argue to a jury that foster care benefits are not compensable but attendant care

benefits are." The trial court remarked that this appeared to be a question of law. Counsel replied, "There is naturally overlap and Group 1 Home is not requesting fees for adult foster care, they are requesting fees for attendant care. [Defendant is] trying to use an end run by citing the overlap to get out of paying for the whole thing." Ava's counsel stated that Richardson's case manager, not the Group 1 Home staff, supervised Richardson. Richardson's guardian was appointed to ensure Richardson's care, control, and custody. Group 1 Home was not "in charge of whether or not he was humiliated, intimidated, whether or not he was exploited for financial or social or moral purposes. That was the guardian's obligation." Ava's counsel added, "Just because attendant care is being provided and just because some of those same services are under the umbrella of provision of an adult foster care home doesn't equate that this attendant care and the residence where it's being provided suddenly becomes an adult foster care home."

The court ruled that Group 1 Home could be compensated only for the services that did not require licensure. In other words, Group 1 Home could be compensated for services such as hygiene and medication assistance, but it could not be compensated for room and board because that required licensure. The trial court denied defendant's motion for summary disposition, but ruled that defendant "is not liable for expenses related to room and board."

The trial court allowed a hearing for reconsideration. Following arguments, the trial court questioned whether Richardson's placement was appropriate because he was "in need of all of the foster care, security, maintenance, the supervision." The court stated, "I can't put him under a bridge and expect [defendant] to give him attendant care." The trial court also indicated that plaintiff's case manager and guardian should have placed him in an adult foster care home.[1] The trial court then disallowed any reimbursement for services rendered before the guardian was appointed, reasoning that Ava did not have authority to place Richardson in anything other than a licensed adult foster care home.

At trial, Ava called Marcus Murray, who testified that he was one of the owners of Ava Macomb Home. Murray testified that the Detroit Medical Center (DMC) contacted him regarding Richardson. DMC indicated that Murray did not have "actual identification." He did not have family support. Richardson was "non-ambulatory or having great difficulty with ambulation at that time." He had hearing deficits and visual deficits. DMC did not know anything about Richardson's income or funding. Richardson could not return to his basement room in his uncle's house because he was bedbound and unable to climb stairs.

Murray stated that he looked for "a solution that would not cost, where we could partner with a provider that would provide the simple activities of daily living and assistance and that's how this all came about." Murray contacted Kenneth Allen, the owner of Group 1 Home, regarding a placement for Richardson. Murray testified that the typical range for attendant care was $17 to $30 an hour. There was no licensing requirement for attendant care facilities. Murray inspected attendant care facilities to see if they had adequate equipment.

---

[1] Our review of the record leads us to share the same concerns voiced by the trial court relative to the actions or inactions of the case manager and guardian.

Murray testified that Richardson required monitoring for seizures. Murray stated that the basis for his care was assistance with activities of daily living, per his physician's prescription. These activities were "things that involve bathing, grooming, ambulating, transferring, hygiene, toileting, assistance with transferring and the ability to start a task and follow it all the way through the completion." A person required assistance if he could not "perform those tasks independently through to completion."

Allen testified that he owned Group 1 Home and the home was an "assisted living facility." It did not hold any license. Richardson resided at the Southfield facility, where he received "24 hour attendant care." Group 1 Home's employees were certified in "CPR, first aid and med training, medication." The state did not issue a license for providing attendant care. Allen testified that staff members assisted Richardson with daily activities such as showering, personal hygiene, dressing, medication and transportation. Allen testified that the home was not a "lockdown facility." Richardson was free to come and go as he pleased. If he walked out of the house, someone would walk with him and call his guardian to advise him that Richardson left out. He would not be prevented from leaving the home.

Allen charged $470 daily for 24-hour attendant care. This payment covered "paying a person to be there 24 hours a day as well as overhead, utilities, everything that goes with that, food . . . ." Allen determined the rate in consultation with Murray. Allen met with Murray and a social worker while Richardson was still hospitalized in 2012.

Allen testified that he understood that the trial court disallowed recovery for room and board and for supervision. He acknowledged that he could recover only for personal care, i.e., clothing and dressing assistance, bathing and personal hygiene assistance, medication, and transfer ambulation. Allen admitted that he did not know anything about Richardson's level of functioning before the accident.

Following the close of proofs, the trial court instructed the jury that plaintiffs were entitled to no-fault benefits for "allowable expenses which consist of reasonable charges for reasonably necessary products, services and accommodations for the plaintiff's care, recovery or rehabilitation." The court also instructed the jury that "the plaintiffs are not eligible for compensation for room and board. . . . [T]his Court ruled plaintiffs are not eligible for compensation for supervision."

In closing arguments, Ava sought approximately $66,000 for attendant care plus interest and $22,955 plus interest for case management services. Group 1 Home sought $203,510 in attendant care, based on 433 days at $470 a day from August 19, 2013, to November 7, 2014 (from appointment of guardian to the day of trial, minus 13 days in which Richardson was hospitalized).

On a special verdict form, the jury found that attendant care, in the amount of approximately $203,510, was an allowable expense owed to Group 1 Home. The jury awarded Ava zero for attendant care and $22,955 for case management with interest.

On December 23, 2014, the trial court entered a judgment in favor of Ava in the amount of $65,411.11. Defendant does not appeal this judgment in favor of Ava.

-4-

On January 27, 2015, the trial court entered a judgment awarding Group 1 Home $203,510 for attendant care, $148 for transportation, $22,746.96 in penalty interest, $5,688.05 for prejudgment interest, $3,712.54 in costs, and $22,420 in case evaluation sanctions, resulting in a total judgment amount of $258,255.55. Thereafter, the trial court denied defendant's motion for judgment notwithstanding the verdict (JNOV), remittitur, and/or a new trial. Defendant now appeals by right the January 27, 2015, order in favor of Group 1.

## II. ANALYSIS

Defendant argues that it was entitled to summary disposition or JNOV because, as a matter of law, Group 1 was not entitled to reimbursement for any of the services provided where it was not a licensed adult foster care facility.

We review a trial court's grant or denial of a summary disposition de novo. *Latham v Barton Malow Co*, 480 Mich 105, 111; 746 NW2d 868 (2008). A motion for summary disposition under MCR 2.116(C)(10) tests the factual support for a claim. *Walsh v Taylor*, 263 Mich App 618, 621; 689 NW2d 506 (2004). The motion is properly granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Quinto v Cross & Peters Co*, 451 Mich 358, 362; 547 NW2d 314 (1996). The reviewing court considers "the pleadings, admissions, affidavits, and other relevant documentary evidence of record in the light most favorable to the nonmoving party to determine whether any genuine issue of material fact exists to warrant a trial." *Walsh*, 263 Mich App at 618.

Similarly, a trial court's decision on a motion for JNOV is reviewed de novo. *Dell v Citizens Ins Co of America*, 312 Mich App 734, 290; 880 NW2d 280 (2015). "In reviewing a decision regarding a motion for JNOV, this Court must view the testimony and all legitimate inferences that may be drawn therefrom in a light most favorable to the nonmoving party. If reasonable jurors could have honestly reached different conclusions, the jury verdict must stand." *Id.* at 290-291 (citation and internal quotation marks omitted). Issues concerning the proper interpretation and application of statutes are reviewed de novo. *Doe v Boyle*, 312 Mich App 333, 343; 877 NW2d 918 (2015).

"Under personal protection insurance an insurer is liable to pay benefits for accidental bodily injury arising out of the ownership, operation, maintenance or use of a motor vehicle . . . ." MCL 500.3105(1). The no-fault statute provides benefits for four categories of PIP benefits. These categories are: survivor's loss, allowable expenses, work loss, and replacement services. *In re Carroll Estate*, 300 Mich App 152, 159; 832 NW2d 276 (2013). With respect to allowable expenses, MCL 500.3107(1)(a) provides, in pertinent part:

> (1) Except as provided in subsection (2), personal protection insurance benefits are payable for the following:

> (a) Allowable expenses consisting of all reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation. . . .

MCL 500.3157 provides:

A physician, hospital, clinic or other person or institution *lawfully rendering treatment* to an injured person for an accidental bodily injury covered by personal protection insurance, and a person or institution providing rehabilitative occupational training following the injury, may charge a reasonable amount for the products, services and accommodations rendered. The charge shall not exceed the amount the person or institution customarily charges for like products, services and accommodations in cases not involving insurance. [Emphasis added.]

Defendant argues that Group 1 rendered adult foster care treatment when it was not a licensed adult foster care home; therefore, according to defendant, Group 1 is not entitled to reimbursement because § 3157 requires that treatment be "lawfully rendered."

Group 1 counters that § 3107 and § 3157 should be read separately—i.e. that § 3157 applies only when "treatment" is provided and that attendant care is not "treatment." This argument is not persuasive. Rather, both provisions must be read as a whole. See e.g. *Bush v Shabahang*, 484 Mich 156, 167; 772 NW2d 272 (2009) (noting that "[i]ndividual words and phrases, while important, should be read in the context of the entire legislative scheme" and noting that statutes "must be interpreted in a manner that ensures that it works in harmony with the entire statutory scheme.") Here, when the two statutory provisions are read together as a whole, it is clear that the Legislature intended for "treatment" to include all "reasonably necessary products, services, and accommodations for an injured person's care, recovery, or rehabilitation." Thus, read together, it is clear that "care" and "treatment" are not mutually exclusive alternatives. Instead, "care, recovery, and rehabilitation" are alternative forms of treatment.

Having determined that § 3107 and § 3157 should be read together, we proceed to determine whether Group 1 provided services that were compensable under the no-fault act.

A no-fault claim requires an insured to establish that he or she is entitled to benefits for accidental bodily injury arising out of the ownership, operation, maintenance or use of a motor vehicle. *Cooper v Auto Club Ins Ass'n*, 481 Mich 399, 407; 751 NW2d 443 (2008). The claimant must prove that the charge for the service was reasonable, the expense was reasonably necessary, and it was incurred. *Williams v AAA Mich*, 250 Mich App 249, 258; 646 NW2d 476 (2002).

The adult foster care facility licensing act contains the following definition of "adult foster care facility":

"Adult foster care facility" means a governmental or nongovernmental establishment that provides foster care to adults. Subject to section 26a(1), adult foster care facility includes facilities and foster care family homes for adults who are aged, mentally ill, developmentally disabled, or physically disabled who require supervision on an ongoing basis but who do not require continuous nursing care. Adult foster care does not include any of the following:

* * *

-6-

(h) * * * a hotel or rooming house that does not provide or offer to provide foster care.  [MCL 400.703(4)(h).]

The term "foster care" is defined as "the provision of supervision, personal care, and protection in addition to room and board, for 24 hours a day, 5 or more days a week, and for 2 or more consecutive weeks for compensation."  MCL 400.704(7).  "Personal care" is defined as "personal assistance provided by a licensee or an agent or employee of a licensee to a resident who requires assistance with dressing, personal hygiene, grooming, maintenance of a medication schedule as directed and supervised by the resident's physician, or the development of those personal and social skills required to live in the least restrictive environment."

Defendant contends that Group 1 Home was providing adult foster care to Richardson despite having no license to do so, and therefore, Group 1 Home was not "lawfully rendering treatment" as required by MCL 500.3157.

In a somewhat similar case, in *Healing Place, Ltd v Farm Bureau Mut Ins Co of Mich*, unpublished opinion per curiam of the Court of Appeals, issued August 5, 2010 (Docket No. 286050), reversed 488 Mich 1026 (2011) ("*Wallace*"), the insured, Linda Wallace, was involved in an automobile accident.  Following the accident, she was in a coma and suffered from posttraumatic amnesia.  She sustained several lacerations and contusions, fractures to her hip and femur, and a traumatic brain injury.  *Id.*, unpub opn at 1.  This Court summarized Wallace's treatment with the plaintiff providers:

> Following the accident, Wallace sought treatment with the various facilities that are plaintiffs in this cause of action.  Dr Roman Frankel founded each of those facilities.  Two of the facilities, Another Step Forward and The Healing Place, treat individuals who have substance abuse problems coupled with traumatic brain injuries and psychological disorders.  Another Step Forward is a day program that provides certain group therapy programs on weekdays.  The Healing Place is a structured residential program that provides both group and individual treatments and has two operational centers.  The first is the Healing Place at North Oakland Medical Center (NOMC).  The other is the Healing Place residential program, an apartment-based program for individuals who have advanced beyond the NOMC program.  While it is not clear whether Another Step Forward has any type of license, The Healing Place is a licensed residential substance abuse facility.  The third facility, New Start, is an outpatient facility that focuses on patients with a wide variety of disorders, from substance abuse to gambling addictions.  New Start is licensed by the State of Michigan as a mental health/substance use disorder clinic.
>
> While Wallace was at Dr. Frankel's various facilities, she received treatment from Dr. Bruce Lessien.  Dr. Lessien is certified in psychiatry and served as a consultant to the Healing Place.  Wallace met with Dr. Lessien approximately once a month for several years, beginning in 2001.  Each time that Dr. Lessien met with Wallace, he administered psychotherapy treatments.  Dr. Lessien concluded that Wallace suffered from an organic mood disorder, bipolar disorder and dementia.  He felt that these conditions apparently were exacerbated

by the accident. Dr. Lessien is treating the conditions with multiple psychotropic medications. [*Wallace*, unpub opn at 1-2.]

The defendant insurer denied the plaintiff benefits for these treatments on the ground that none of the providers were licensed as psychiatric hospitals or as adult foster care facilities. *Id*., unpub opn at 2. The trial court granted summary disposition for the defendant on the ground that "the treatment rendered by the plaintiffs was outside the scope of their operative license." *Id*., unpub opn at 3. With respect to the adult foster care issue, in reversing the trial court in part, this Court considered the definition of "adult foster care facility" in MCL 400.703(4) and concluded that the evidence "does not establish that plaintiff facilities provided services to Wallace that could only be provided by a licensed adult foster care facility." *Id*., unpub opn at 6. The majority concluded:

> While the staff was available to Wallace at all times of the day, there is no indication that she was receiving ongoing supervision. Therefore, the trial court's grant of summary disposition was in error to the extent that it was the result of a determination that plaintiffs provided Wallace with adult foster care facility services. The decision in *Naylor* was based on the specific facts of that case. The *Naylor* opinion, while concluding that the services were of the nature of those provided in adult foster care, does not provide extensive details regarding the services provided to the patient. Based on the extensive record available in the present case, it is clear that the facilities were not providing the types of services to Wallace that are within the ambit of the applicable statutes. [*Id*., unpub opn at 6-7.]

Judge WILDER dissented in part, disagreeing with the majority's conclusion that the facilities were not providing adult foster care. Judge WILDER cited evidence that Wallace "received 24-hour staff interaction," and that the staff maintained a medication schedule for her. *Wallace* (WILDER, J., dissenting in part and concurring in part). Wallace was in need of "external controls" regarding the maintenance of her apartment, and regarding which visitors were permitted or not permitted in her apartment. Wallace also was in need of external controls to avoid substance abuse relapse. *Id*., dissenting opn at 1-2. Judge WILDER concluded that the defendant was entitled to summary disposition because ample evidence established that Wallace required ongoing supervision, but not continuous nursing care, which placed her in the class of persons receiving care in adult foster care facilities as defined at MCL 400.703(4). *Id*., dissenting opn at 2.

Our Supreme Court subsequently reversed that portion of this Court's judgment in *Wallace* "that reversed the Oakland Circuit Court's grant of summary disposition to the defendant regarding adult foster care services, for the reasons stated in the Court of Appeals partial dissenting opinion." *Healing Place, Ltd v Farm Bureau Mut Ins Co*, 488 Mich 1026; 792 NW2d 341 (2011) ("*Wallace II*").

The dissenting opinion in *Wallace* was not based primarily on the nature of the services. Instead, the dissenting opinion also focused on the injured person's needs in consideration of the language of MCL 400.703(4), which states that an "adult foster care facility includes facilities and foster care family homes for adults who are aged, mentally ill, developmentally disabled, or

physically disabled who require supervision on an ongoing basis but do not require continuous nursing care." *Wallace*, dissenting opn at 2. Judge WILDER determined that Wallace "require[d] supervision on an ongoing basis" because she needed "external controls." *Id.*, dissenting opn at 2. Our Supreme Court gave legal effect to Judge WILDER'S dissenting opinion by reversing the majority opinion "for the reasons stated in the Court of Appeals partial dissenting opinion." *Wallace II*, 488 Mich 1026. "An order that is a final Supreme Court disposition of an application and that contains a concise statement of the applicable facts and reasons for the decision is binding precedent." *Dykes v William Beaumont Hosp*, 246 Mich App 471, 483; 633 NW2d 440 (2001). Accordingly, the issue whether Richardson received adult foster care from Group 1 Home must be resolved in accordance with Judge WILDER'S dissenting opinion in *Wallace*.

In this case, at the summary disposition stage, there was no question of fact to contest that Richardson fell into the class of person that required adult foster care services and that Group 1 provided those services without a license. Allen testified at a deposition that Richardson received room and board, 24-hour attendant care, transportation to and from appointments, laundry services, bathing assistance, cooking, medication assistance, cleaning services, and monitoring for safety. Allen explained that the daily rate was one rate that included all of the services including room and board. There was no factual dispute that Richardson clearly "require[d] supervision on an ongoing basis," and he therefore belonged to the class of persons served by an adult foster care facility. Indeed, the trial court found that Richardson was "in need of all of the foster care, security, maintenance, the supervision." Furthermore, in addressing whether Group 1 could recover for services provided before the appointment of a guardian, the court found that "this should have been a licensed facility providing this and [Ava] as case manager placed him with a facility that wasn't licensed to provide it." Richardson's circumstances are analogous to the insured's circumstances in *Wallace*. The similarity between Richardson and Wallace supported defendant's position that Group 1 Home did not lawfully render services to Richardson.

The trial court, however, believed that it could separate supervision and room and board from other services rendered to Richardson, and compensate Group 1 Home only for the provision of attendant care services. At the summary disposition stage, however, Group 1 Home's evidence did not provide an evidentiary basis for segregating a portion of the $470 daily charge and assigning it to lawfully rendered services. After the trial court ruled in its order granting partial summary disposition for defendant that room and board and supervision were not compensable, Group 1 Home merely declared that it provided free room and board to Richardson so that he could receive attendant care in the facility. At the time the trial court heard defendant's summary disposition motion, Allen had testified in his deposition that the $470 charge included room and board, and that he had not itemized the charge. He stated, "I didn't know I had to break that number down. That's the rate that I agreed to, and that was supposed to have been the rate per day." He indicated that he could break it down if required to do so. At that point in the proceedings, Group 1 Home had not come forward with any evidence itemizing the $470 daily rate. Indeed, Group 1 Home failed to present any evidence to dispute that it was providing adult foster care services. It was only after the trial court's summary disposition ruling that Group 1 Home represented that room and board was not included in the $470 daily rate, because it offered Richardson free housing to enable Group 1 Home to provide attendant care.

By allowing Group 1 Home to subsequently contradict Allen's testimony with more favorable evidence, the trial court erred in that "summary disposition cannot be avoided by a party's conclusory assertions in an affidavit that conflict with the actual historical conduct of the party." *Bergen v Baker*, 264 Mich App 376, 389; 691 NW2d 770 (2004). The trial court should therefore have granted summary disposition for defendant.

In sum, we reverse the judgment entered in favor of Group 1 Home; at the summary disposition hearing, there was no genuine issue of material fact to support that Group 1 Home lawfully rendered services to the insured because Group 1 Home was not licensed as an adult foster care facility and was providing adult foster care services to Richardson. Defendant was entitled to summary disposition pursuant to MCR 2.116(C)(10).

Group 1 Home argues that the trial court erred in denying attendant benefits before the appointment of Richardson. However, for the reasons discussed above, Group 1's argument fails and we affirm that part of the trial court's order denying benefits before the appointment of the guardian.

Affirmed in part, vacated in part, and remanded for entry of an order awarding summary disposition in favor of defendant. No costs awarded. MCR 7.219(A). We do not retain jurisdiction.

/s/ Michael F. Gadola
/s/ Stephen L. Borrello
/s/ Cynthia Diane Stephens

-10-