*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

GREGORY CARL GRAHAM III, by LAKISHA
JOHNSON, Guardian,

        Plaintiff-Appellee/Cross-Appellant,

v

DONTAE D. JACKSON and STEPHANIE J.
HALL,

        Defendants,

and

EVEREST NATIONAL INSURANCE COMPANY,

        Defendant/Cross-Defendant-
        Appellant/Cross-Appellee,

and

USAA CASUALTY INSURANCE COMPANY,

        Defendant/Cross-Defendant-Appellee,

and

TITAN INSURANCE COMPANY,

        Defendant/Cross-Plaintiff-Appellee.

UNPUBLISHED
June 18, 2020

No. 346734
Wayne Circuit Court
LC No. 16-017095-NI

Before: MURRAY, C.J., and JANSEN and MARKEY, JJ.

PER CURIAM.

Defendant Everest National Insurance Company (Everest) appeals as of right the trial court's order granting in part and denying in part plaintiff's motion for a declaratory judgment, interest, and attorney fees in this first-party action under the no-fault act, MCL 500.3101 *et seq.* Plaintiff cross-appeals the same order. We affirm.

## I. BACKGROUND

Plaintiff's ward and son, Gregory Graham III, suffered catastrophic injuries in a motor vehicle accident on October 7, 2016. The 18-year-old Graham was riding as a passenger in a vehicle owned by defendant Stephanie J. Hall and driven by defendant Dontae D. Jackson.[1] Defendant USAA Casualty Insurance Company (USSA) was the insurer of Hall's vehicle. Less than three weeks before the accident, on September 20, 2016, plaintiff applied for and was issued a no-fault insurance policy with Everest. The principal issue in this case is whether Everest is liable to pay Graham's no-fault benefits pursuant to that policy. Everest contends that it should be permitted to rescind the policy because of material misrepresentations by plaintiff during the application process. Defendant Titan Insurance Company (Titan) was named as a defendant in this action after the Michigan Automobile Insurance Placement Facility (MAIPF) assigned it as the servicing insurer to pay Graham's no-fault benefits, subject to reimbursement once the trial court determined the proper responsible party.

On her application for insurance, plaintiff listed as the vehicle to be insured a 2000 Ford Excursion. In response to the question, "Are all vehicles you own listed on this application? If no, please explain," plaintiff answered, "Yes." In response to the question, "Do you have any other insured or uninsured vehicles registered in your name not listed on this application?," plaintiff responded, "No." In response to the question, "Do you operate any insured or uninsured vehicles other than the vehicles listed on this application?," plaintiff also responded "No." In a portion of the application under "applicant's statement," it provided, "I agree that if I intentionally conceal or misrepresent a material fact or circumstance relating to the insurance, the policy shall be null and void." In an affidavit filed in this action, plaintiff acknowledged that on the date of Graham's accident, October 7, 2016, she owned two other vehicles in addition to the 2000 Ford Excursion that were not insured with any other insurance carrier. In her deposition, however, plaintiff denied intentionally misrepresenting any facts on her insurance application with Everest, claiming that she was not aware of the questions regarding her ownership of other vehicles because the insurance agent who assisted her, Jennie Crowder, did not inquire about other vehicles.

Following Graham's motor vehicle accident, plaintiff filed a claim for no-fault benefits with Everest on behalf of Graham. Everest declined to pay benefits for Graham, claiming that it was investigating plaintiff's claim. Plaintiff then filed this action for negligence against Jackson, "owner's liability" against Hall, and breach of contract against Everest for nonpayment of personal protection insurance (PIP) benefits for Graham pursuant to its insurance policy. In an amended complaint, plaintiff added USAA, the insurer of Hall's vehicle, as a defendant and requested declaratory relief from the trial court to determine the respective obligations of both Everest and

---

[1] On August 3, 2017, the trial court entered a stipulated order dismissing defendants Jackson and Hall from this action with prejudice.

USAA to pay Graham's no-fault benefits. Twice during the early stages of this litigation, plaintiff moved for the trial court to order Everest to pay Graham's outstanding expenses, and on March 7, 2017, the trial court ordered plaintiff to amend her complaint to add the MAIPF as a necessary party under MCR 2.205 and MCL 500.3172(3), given the priority dispute between Everest and USAA. Plaintiff filed a second amended complaint adding the MAIPF as a party, and the trial court later entered a stipulated order substituting Titan, as the assigned servicing insurer, in place of the MAIPF. Titan filed a cross-complaint against Everest and USAA, requesting reimbursement for no-fault benefits it paid on Graham's behalf.

On April 9, 2018, the trial court granted summary disposition in favor of Everest on the basis of its determination that plaintiff's misrepresentations during the application process entitled it to rescind its policy. On July 18, 2018, the Michigan Supreme Court decided *Bazzi v Sentinel Ins Co*, 502 Mich 390; 919 NW2d 20 (2018) ("*Bazzi II*"), in which it sought to clarify whether its prior decision in *Titan Ins Co v Hyten*, 491 Mich 547; 817 NW2d 562 (2012), "abrogated the innocent third-party rule," which had stated that public policy precluded an insurer from seeking rescission of an insurance policy on the basis of fraud when an innocent third party suffers an injury. The Court held that "rescission does not function by automatic operation of the law." *Id*. at 411. Rather, the trial court must engage in a balancing of the equities to determine whether the party seeking rescission is entitled to that relief. *Id*. at 410.

On August 13, 2018, USAA filed a motion under MCR 2.604 to set aside the trial court's April 9, 2018 order granting Everest's motion for summary disposition. USAA argued that under *Bazzi II*, the trial court was required to "balance the equities" to determine whether rescission should be granted with respect to Graham, an innocent third party. The trial court ultimately held that a balancing of the equities as between Everest and Graham weighed against allowing Everest to rescind its no-fault policy with plaintiff with respect to Graham. Accordingly, the court set aside its prior order granting summary disposition in favor of Everest.

USAA and Titan subsequently moved for summary disposition under MCR 2.116(C)(10), and the trial court granted their motions. Thereafter, plaintiff filed a motion for declaratory judgment, interest, and attorney fees. The trial court determined that Everest was liable for no-fault attorney fees and penalty interest, and awarded plaintiff reasonable attorney fees of $30,500, which was less than plaintiff had requested, as well as $16,734.72 in penalty interest. Everest now appeals as of right, challenging the trial court's decision to set aside the prior order granting summary disposition in favor of Everest and the court's determination that a balancing of the equities did not favor rescission of its insurance policy with respect to Graham. Everest also argues that the trial court erred by determining that plaintiff was entitled to no-fault attorney fees and penalty interest. Plaintiff cross-appeals, arguing that the trial court erred by failing to consider the contingency-fee agreement between plaintiff and counsel when determining a reasonable attorney fee.

## II. BALANCING THE EQUITIES

Everest argues that the trial court erred by revisiting its prior decision to grant summary disposition in Everest's favor and by determining that a balancing of the equities weighed against allowing Everest to rescind its no-fault policy with respect to Graham, an innocent third party. We disagree.

Whether to grant the remedy of rescission is reserved to the sound discretion of the trial court. *Pioneer State Mut Ins Co v Wright*, ___ Mich App ___, ___; ___ NW2d ___ (2020) (Docket No. 347072), lv pending; slip op at 4. A decision constitutes an abuse of discretion when it falls outside the range of reasonable and principled outcomes. *Id*. If the trial court errs in its interpretation and application of the law, it necessarily abuses its discretion. *Id*. We review the trial court's factual findings for clear error, and "a finding is clearly erroneous if the reviewing court is left with a definite and firm conviction that a mistake has been made." *Id*. To the extent that we are required to interpret a pertinent court rule, our review is de novo. *Safdar v Aziz*, 501 Mich 213, 217; 912 NW2d 511 (2018).

Preliminarily, Everest challenges the trial court's decision to entertain USAA's motion to set aside and vacate the trial court's prior order granting summary disposition in favor of Everest. According to Everest, the motion was essentially a motion for summary disposition, so it should have been allowed 21 days to respond as provided in MCR 2.116(G)(1)(a)(i), which provides that a "motion under this rule with supporting brief and any affidavits must be filed and served at least 21 days before the time set for the hearing[.]" USAA argues that because its motion was brought under MCR 2.604(A), the motion was governed by MCR 2.119(C)(1) and it complied with the requirements of that court rule. USAA points out that it was after the trial court set aside and vacated the April 9, 2018 order that it later moved for summary disposition under MCR 2.116, and that Everest was given the requisite notice in compliance with that court rule.

MCR 2.604(1) provides, in pertinent part:

> [A]n order or other form of decision adjudicating fewer than all the claims, or the rights and liabilities of fewer than all the parties, does not terminate the action as to any of the claims or parties, *and the order is subject to revision before entry of final judgment adjudicating all the claims and the rights and liabilities of all the parties*. Such an order or other form of decision is not appealable as of right before entry of final judgment. A party may file an application for leave to appeal from such an order. [Emphasis added.]

Everest does not argue that MCR 2.604(1) did not provide the trial court with authority to set aside and vacate its April 9, 2018 order. We note that in its response to USAA's motion to set aside the April 9, 2018 order, Everest addressed the issue of a balancing of the equities and this issue was also addressed in depth at the hearing on USAA's motion. In *Hill v City of Warren*, 276 Mich App 299, 307; 740 NW2d 706 (2007), this Court recognized that "courts are permitted to revisit issues they previously decided." In *Hill*, the plaintiffs filed a renewed motion for class certification after the Michigan Supreme Court had remanded the case to the trial court and additional discovery was conducted, but the plaintiffs had not presented the motion as one seeking reconsideration under MCR 2.119. *Id*. at 304, 307. In concluding that the motion was procedurally proper, this Court stated:

> In any event, MCR 2.119(F)(1) explicitly refers to MCR 2.604(A) as "another rule" that "provides a different procedure for reconsideration of a decision . . . ." Under MCR 2.604(A), an order that does not dispose of all issues in a case does not terminate the action or entitle a party to appeal as of right and "is subject to revision before entry of final judgment adjudicating all the claims and the rights and

liabilities of all the parties." The court rules therefore give the trial court explicit procedural authority to revisit an order while the proceedings are still pending and, on that reconsideration, to determine that the original order was mistaken, as the trial court did here. [*Hill*, 276 Mich App at 307 (emphasis added).]

See also *Meagher v Wayne State Univ*, 222 Mich App 700, 718-719; 565 NW2d 401 (1997) (recognizing that under MCR 2.604 "an order entered by a trial court may be modified before entry of the final judgment").

Accordingly, the trial court had authority under MCR 2.604(1) to set aside and reconsider its April 9, 2018 order granting summary disposition in favor of Everest. Moreover, we are not persuaded by Everest's argument that USAA's motion to set aside the April 9, 2018 order was the equivalent of a motion for summary disposition. In support of this argument, Everest cites MCR 2.116(B)(1), which provides that "[a] party may move for dismissal of or judgment on all or part of a claim in accordance with this rule." However, while this rule allows a party to seek dismissal of *all* or a *portion* of a claim in a motion under MCR 2.116, it does not follow that every motion that seeks to dispose of all or a portion of a claim must be brought under MCR 2.116. Therefore, we reject Everest's claim that USAA's motion to set aside the April 9, 2018 order was in fact a motion for summary disposition subject to MCR 2.116.

USAA also argues that the issue of plaintiff's intentions when completing the insurance application are relevant because both the insurance application and the no-fault policy itself require that a misrepresentation be made with the intention to defraud the insurer in order for the policy to be rescinded. In the no-fault application, plaintiff agreed that "if I intentionally conceal or misrepresent a material fact or circumstance relating to the insurance, the policy shall be null and void." Likewise, the fraud exclusion clause of the no-fault policy provides, in pertinent part:

> We do not provide coverage for any insured who has made fraudulent statements or engaged in fraudulent conduct in obtaining or maintaining this policy or concerning any accident or loss for which coverage is sought under this policy.

Our Supreme Court has held that such exclusionary provisions in insurance contracts require an actual intention on the part of the insured to defraud the insurer to void a policy on the basis of misrepresentation. *West v Farm Bureau Gen Ins Co of Mich*, 402 Mich 67, 69; 259 NW2d 556 (1977). Therefore, USSA's argument that an absence of fraudulent intent would not allow Everest to rescind the policy does have some credence. In our opinion, however, even if we were to credit Everest's argument that plaintiff's misrepresentations on the insurance application provided it with a basis to seek rescission, the trial court did not abuse its discretion by weighing the equities and determining that Everest should not be allowed to rescind the no-fault policy with respect to Graham.

In *Bazzi II*, 502 Mich at 411, the Court held that "rescission does not function by automatic operation of the law" where there is fraud in the application for an insurance policy and an innocent third party is involved. Instead, the trial court must engage in a balancing of the equities to determine whether the party seeking rescission is entitled to that relief. *Id*. at 410. If the remedy of rescission would render an inequitable or unjust result, the court will not grant that remedy. *Id*. In deciding whether rescission is an appropriate remedy where two equally innocent parties are

impacted, the trial court must exercise its equitable powers and determine which of the two blameless parties should bear the loss. *Id.* at 410-411. The Court explained:

> Just as the intervening interest of an innocent third party does not altogether bar rescission as an equitable remedy, neither does fraud in the application for insurance imbue an insurer with an absolute right to rescission of the policy with respect to third parties. Equitable remedies are adaptive to the circumstances of each case, and an absolute approach would unduly hamper and constrain the proper functioning of such remedies. [*Id.*]

Whether rescission is an equitable result must be decided on a case-by-case approach that considers the specific facts of each matter. *Id.*

Because of its conclusion that an absolute approach would not advance the purpose of an equitable remedy such as rescission, the Court in *Bazzi II* did not offer "a clear-cut framework for balancing the equities." *Pioneer*, ___ Mich App at ___; slip op at 6. In *Pioneer*, however, this Court recently held that the " 'non-exclusive list of factors' " set forth by then Chief Justice MARKMAN in his concurring opinion in *Farm Bureau Gen Ins Co v ACE American Ins Co*, 503 Mich 903; 919 NW2d 394 (2018), "present[ed] a workable framework" for balancing the equities to determine whether rescission is an appropriate remedy. *Pioneer*, ___ Mich App at ___; slip op at 7. This Court stated:

> Reduced to their essence, five factors were identified and they address: (1) the extent to which the insurer could have uncovered the subject matter of the fraud before the innocent third party was injured; (2) the relationship between the fraudulent insured and the innocent third party to determine if the third party had some knowledge of the fraud; (3) the nature of the innocent third party's conduct, whether reckless or negligent, in the injury-causing event; (4) the availability of an alternate avenue for recovery if the insurance policy is not enforced; and (5) a determination of whether policy enforcement only serves to relieve the fraudulent insured of what would otherwise be the fraudulent insured's personal liability to the innocent third party. [*Id.*, quoting *Farm Bureau Gen Ins Co of Mich*, 503 Mich at 906-907 (MARKMAN, C.J., concurring).]

The trial court, recognizing that the appellate courts post-*Bazzi II* had not yet had the opportunity to provide guidance with respect to the factors to consider in weighing the equities, fashioned its own set of factors that it believed should guide the inquiry with respect to a weighing of the equities, those being (1) "what was the basis for the insurance company's claim of rescission and what are the facts that surround the rescission," (2) whether plaintiff's misrepresentation was intentional, (3) "did the injured party participate in the misrepresentation and if so to what extent," (4) "if the policy is to be rescinded as to the injured party are there [no-fault] benefits otherwise available to that injured party," and (5) "laches, how long did the insurance company wait to rescind the policy, what was the point in time," and what other actions did the insurance company take during this relevant time period with respect to payment or nonpayment of benefits on behalf of the injured party.

Although the trial court here did not have the benefit of this Court's decision in *Pioneer*, which adopted the factors set forth in then Chief Justice MARKMAN'S concurrence in *Farm Bureau Gen Ins Co of Mich*, when it endeavored to balance the equities, the court's analysis reflects that several of those factors were considered.

In *Pioneer*, this Court agreed that the nature of the innocent third party's conduct, particularly whether it is reckless or negligent in the event causing the injury, should be considered. *Pioneer*, ___ Mich App at ___; slip op at 7. Consistent with this Court's reasoning in *Pioneer*, the trial court considered the extent to which Graham participated in plaintiff's misrepresentations during the application process, characterizing him as "totally innocent," and it also observed that (1) Graham was an excluded driver on plaintiff's no-fault policy with Everest, and (2) he was merely a passenger in the accident that caused his catastrophic injuries. The trial court did not err by determining that this factor weighed against allowing rescission of the no-fault policy with respect to Graham, given that he did not participate in any fraud and was not reckless or negligent in the event causing his injuries.

The trial court also correctly employed another factor that this Court favored in *Pioneer*, that being whether there is an alternative avenue through which Graham could recover if the no-fault insurance policy with Everest is rescinded. The trial court noted that Graham could recover from USAA or Titan if necessary, but ultimately held that this factor nonetheless weighed in favor of Graham and against rescission, considering the Legislature's expressed intent in MCL 500.3114(1) to place Everest first in the line of priority for no-fault coverage because Graham was domiciled in plaintiff's household when the accident occurred. Contrary to Everest's argument, the trial court did not "dismiss" or ignore consideration of this factor. The trial court was also concerned by the fact that Everest, while investigating plaintiff's claim, initially would not pay for Graham's medical services, which jeopardized his medical care, even after Everest's initial investigation revealed that plaintiff did not make any representations in her application for insurance. Instead, plaintiff was required to file a motion for declaratory judgment to obtain payment of medical expenses, and even after the trial court twice ordered Everest to pay Graham's medical bills, Everest was resistant and reluctant to do so. Under these circumstances, we do not believe the trial court abused its discretion by weighing this factor against rescission.

With regard to the remaining factors set forth in *Pioneer*, ___ Mich App at ___; slip op at 7, those being whether (a) Everest could have discovered the subject matter of the fraud before Graham was injured, and (b) enforcement of the no-fault policy would only serve to relieve plaintiff of her personal liability to Graham, the trial court did not weigh these factors expressly, presumably because it did not have the benefit of then Chief Justice MARKMAN'S concurring opinion in *Farm Bureau Gen Ins Co* or this Court's decision in *Pioneer* when it issued its ruling. In *Farm Bureau Gen Ins Co*, then Chief Justice MARKMAN explained his reasoning with regard to the factor involving the insurer's knowledge of or ability to discover the fraud:

> First, the extent to which the insurer, in fact, investigated or could have investigated the subject matter of the fraud before the innocent third party was injured, which may have led to a determination by the insurer that the insurance policy had been procured on a fraudulent basis. If the insurer could have with reasonable effort obtained information indicating that the insured had committed fraud in procuring the insurance policy, equity may weigh against rescission because the insurer may

be deemed to have acted without adequate professional diligence in issuing and maintaining the policy. [*Farm Bureau Gen Ins Co*, 503 Mich at 906 (MARKMAN, C.J., concurring).]

In a footnote, Chief Justice MARKMAN, quoting *Dietz v Dietz*, 298 Mich 253, 258; 298 NW 522 (1941), observed that " '[t]he law assists those who are vigilant, not those who sleep upon their rights.' " *Farm Bureau Gen Ins Co*, 503 Mich at 906 n 3 (MARKMAN, C.J., concurring) (parentheses omitted).

With regard to Everest's ability to uncover information related to plaintiff's misrepresentations during the application process, the trial court placed emphasis on the fact that plaintiff had successfully applied for insurance with Everest in April 2016 for another vehicle and the policy for that vehicle lapsed for nonpayment of premiums. The trial court reasoned that Crowder could have easily ascertained that plaintiff had additional vehicles that she was not seeking to insure when she applied for insurance on September 20, 2016. In *Pioneer*, this Court acknowledged that evaluating whether an insurer could have uncovered fraud before the innocent third party was injured is *not* tantamount to imposing a duty upon an insurer to investigate, which the Supreme Court in *Titan* held an insurer does not have, "but merely addresses the process of procurement of insurance and any information disclosed." *Pioneer*, ___ Mich App at ___; slip op at 8 n 8. While we do not suggest that Everest had a duty to investigate the veracity of plaintiff's representations in her no-fault application, the fact remains that plaintiff had visited the agency only five months earlier to secure insurance for a different vehicle, and Crowder conceded that the information regarding the prior application would have been available and accessible in the agency's file for plaintiff. Even setting aside the question whether Crowder was acting as an agent for Everest, given plaintiff's prior April 2016 policy with Everest for another vehicle that had lapsed, this information would have been accessible to Everest as well. The present case is therefore one in which the facts suggest that with "reasonable effort" Everest could have obtained information calling into question the veracity of the representations in plaintiff's application for insurance, and that Everest did not act with professional diligence in issuing and maintaining the policy. *Farm Bureau Gen Ins Co*, 503 Mich at 906. The trial court's analysis was consistent with the framework approved in *Pioneer*, ___ Mich App at ___; slip op at 7.

Finally, with regard to the fifth factor articulated by then Chief Justice MARKMAN in *Farm Bureau Gen Ins Co* and adopted in *Pioneer*, this Court held in *Pioneer* that the factor was not applicable under a factual scenario similar to this case. *Id*. at ___; slip op at 7-8. In *Pioneer*, the defendant, Vanetta Wright, secured a policy of no-fault insurance from the plaintiff insurance company, but did not identify her adult son as a driver or resident in her home. *Id*. at ___; slip op at 2. Five months later, the adult son, who did not own his vehicle or carry no-fault insurance, was injured in a motor vehicle accident while he was traveling as a passenger in a vehicle owned by a third party. *Id*. This Court held that the fifth factor was not applicable because "the only apparent wrongdoer" was the defendant, Wright, who was not involved in the accident, and her adult son was not the "fraudulent insured" or the driver of the vehicle in which the innocent third party was injured. *Id*. at ___; slip op at 8-9. Accordingly, this factor likewise would not be applicable here, given that the only alleged wrongdoer was plaintiff, who was not involved in the accident, and Graham was not the "fraudulent insured" and was not driving the vehicle in which he was injured. *Id*. at ___; slip op at 9.

Everest criticizes the trial court's ruling by claiming that the court "eschewed the traditional equity maxims" of Michigan law and instead fashioned its own factors for determining whether to allow Everest to rescind the no-fault policy. At the hearing on USAA's motion to set aside the prior summary disposition order, the trial court asked counsel for Everest not to focus on the maxims of equity because they were not applicable and did not address the facts of the case. The court stated that it was instead guided by the Supreme Court's directive in *Bazzi II*, 502 Mich at 410, that it balance the equities as between Everest and Graham in deciding whether the remedy of rescission should be granted. Moreover, a review of the trial court's extended dialogue with counsel for Everest and USSA, as well as its decision, makes it clear that the court was very aware of its obligation to exercise discretion to grant or deny the remedy of rescission in a manner that was just and equitable, and that it bore the serious responsibility of deciding, as between Graham and Everest, who should assume the loss. See *id*. at 410-411 (recognizing that the remedy of rescission should not be granted if the ultimate result would be unjust or inequitable, and the trial court must decide which blameless party, between two innocent parties, should carry the burden of a loss). Therefore, we reject Everest's argument that the trial court erred by ignoring pertinent equitable considerations.

Everest also argues that the trial court's conclusion that the evidence did not reflect that plaintiff intentionally engaged in misrepresentation is contrary to Michigan law. In *Titan*, 491 Mich at 555, our Supreme Court recognized that the common-law doctrine of innocent misrepresentation may allow a party to a contract to seek a legal or equitable remedy. See also *Farm Bureau Gen Ins Co of Mich*, 503 Mich 904 n 1 (MARKMAN, C.J, concurring) (recognizing that *Bazzi II* will also apply to cases in which the insured engaged in innocent misrepresentation). The trial court did emphasize that plaintiff's misrepresentations were not intentional, but it did not state that they were not wrongful. Moreover, it considered the level of plaintiff's conduct in the context of balancing the equities to discern which of the two innocent parties, Graham and Everest, should bear the loss because of plaintiff's conduct and whether their acts or neglect allowed plaintiff to commit the wrong at issue. *Bazzi II*, 502 Mich at 411. The trial court in no way suggested that plaintiff had not engaged in misrepresentation under Michigan law, but only weighed what the court characterized as plaintiff's lack of intent to defraud in determining which of the two innocent parties, Graham and Everest, should bear the loss occasioned by plaintiff's wrongful conduct. While the nature of the misrepresentation and the insurer's intention are not included in then Chief Justice MARKMAN'S "nonexclusive list of factors" in *Farm Bureau Gen Ins Co*, 503 Mich at 905, then Chief Justice MARKMAN noted that the inquiry of which innocent party should bear the burden of an insured's fraud is not one suited to "mechanical principles[,]" and that the factors as articulated "are largely of a character that inform to the best of the law's ability the court's exercise of judgment concerning the 'equitable' relationship between the innocent parties and between the innocent parties and the responsible party." (Emphasis added.) Then Chief Justice MARKMAN also provided further guidance with respect to employing the relevant factors, stating:

> In few cases will all of these factors be applicable; in some cases, none will be applicable; and in other cases, additional factors may be applicable. Furthermore, these and other factors should not be so rigidly or mechanically applied by merely "counting them" in terms of favoring one or the other side such that the ultimate decision-making standard is obscured, concerning the respective

levels of "innocence" of the insurer and the innocent third party. [*Id*. at 907 (MARKMAN, C.J., concurring.]

In our view, considering that the list of factors set forth in then Chief Justice MARKMAN'S concurring opinion, and which this Court adopted in *Pioneer*, are not exclusive or exhaustive, and will depend on the factual circumstances of each case, the trial court's consideration of plaintiff's lack of fraudulent intent, and its weighing of this factor in favor of Graham and against rescission when balancing the equities, was not an error of law. Because the court's consideration of this factor is consistent with a reasonable and principled outcome under the circumstances, the court did not abuse its discretion.

In sum, the trial court's decision reflects its diligent and thorough attempt to weigh the equities, it was based on appropriate consideration of relevant factors, and the ultimate decision to not allow rescission of the no-fault policy is not outside the range of reasonable and principled outcomes. Therefore, we affirm the trial court's decision.

## III. ATTORNEY FEES AND INTEREST

Everest argues that the trial court erred by awarding plaintiff no-fault attorney fees and penalty interest. On cross-appeal, plaintiff challenges the amount of attorney fees awarded, arguing that the trial court erred by not considering the contingency-fee agreement that she had with counsel. We reject both claims of error.

The trial court's factual determination regarding whether an insurance company acted reasonably with regard to paying no-fault benefits "involves a mixed question of law and fact." *Moore v Secura Ins*, 482 Mich 507, 516; 759 NW2d 833 (2008), quoting *Ross v Auto Club Group*, 481 Mich 1, 7; 748 NW2d 552 (2008). "What constitutes reasonableness is a question of law, but whether the defendant's denial of benefits is reasonable under the particular facts of the case is a question of fact." *Moore*, 482 Mich at 516, quoting *Ross*, 481 Mich at 7. Findings of fact are reviewed for clear error, which will be found when this Court is left with a definite and firm conviction that the trial court made a mistake. *Moore*, 482 Mich at 516.

Where attorney fees are authorized, we review the trial court's award of attorney fees for an abuse of discretion. *Pirgu v United Servs Auto Ass'n*, 499 Mich 269, 274; 884 NW2d 257 (2016). The court abuses its discretion when its determination of attorney fees falls outside the range of reasonable and principled outcomes, or it errs in its application of the law. *Id*. With respect to no-fault penalty interest, we review for clear error a trial court's finding whether an insurer was provided with "reasonable proof of the fact and loss sustained" under MCL 500.3142(1). *Williams v AAA Mich*, 250 Mich App 249, 264; 646 NW2d 476 (2002). We review de novo issues involving the interpretation of MCL 500.3142(2) and its application to the facts of a case. *Bronson Health Care Group, Inc v Titan Ins Co*, 314 Mich App 577, 582; 887 NW2d 205 (2016).

At the time the trial court awarded attorney fees, MCL 500.3148(1) provided:

> An attorney is entitled to a reasonable fee for advising and representing a claimant in an action for personal or property protection insurance benefits which

are overdue. The attorney's fee shall be a charge against the insurer in addition to the benefits recovered, *if the court finds that the insurer unreasonably refused to pay the claim or unreasonably delayed in making proper payment*. [Emphasis added.][2]

The purpose of the attorney fee penalty provision in the no-fault act is to ensure that the insured receives prompt payment of benefits. *Beach v State Farm Mut Auto Ins Co*, 216 Mich App 612, 629; 550 NW2d 580 (1996).

In *Moore*, our Supreme Court held that § 3148(1) "establishes two prerequisites for the award of attorney fees." *Moore*, 482 Mich at 517. First, the benefits must be overdue as contemplated by MCL 500.3142(2), which means they were "not paid within 30 days after an insurer receives reasonable proof of the fact and of the amount of loss sustained." *Moore*, 482 Mich at 517. Under the second requirement, the trial court must determine if the insurer " 'unreasonably refused to pay the claim or unreasonably delayed in making proper payment.' " *Id*., quoting MCL 500.3148(1). "[A]n insurer's refusal to pay benefits is not unreasonable [i]f the insurer's refusal or delay in payment is the product of a legitimate question of statutory construction, constitutional law, or a bona fide factual uncertainty." *Moore*, 482 Mich at 520 (citation and quotation marks omitted). The trial court must make a fact-specific determination to decide whether the no-fault insurer's refusal to pay was unreasonable. *Id.* at 522. This Court recently stated that when an insurance company refuses to tender payment of benefits, a rebuttable presumption will arise that requires the insurance company to justify its refusal. *Slocum v Farm Bureau Gen Ins Co of Mich*, 328 Mich App 626, 643; 939 NW2d 717 (2019). The determinative inquiry is not whether the insurer is ultimately held liable to pay the benefits, but whether the initial decision to not pay benefits was unreasonable. *Id*.

In her February 2, 2017 affidavit, plaintiff averred that she provided Everest with a completed application for benefits shortly after Graham's accident, and that she attended an in-person interview with Everest's investigator, answering all questions that were asked of her. Everest received plaintiff's claim, and informed her that it was conducting an investigation to determine if coverage under the no-fault insurance policy applied, and if Graham was eligible for PIP benefits. On October 21, 2016, plaintiff sent by facsimile to Everest's claims adjuster an accounting of the hospital's outstanding medical expenses for Graham, in the amount of $274,328.29. On November 9, 2018, plaintiff's counsel informed Everest's claims adjuster by e-mail that Graham had undergone two brain surgeries and was scheduled to be moved to inpatient rehabilitation, but that the rehabilitation facility would not admit Graham without Everest's approval. In the same e-mail, plaintiff's counsel discussed the logistics of having plaintiff attend an in-person interview with Everest's investigator to address "cars and residents in the household," at Everest's request. This interview was held on November 11, 2016, as set forth in a confirming e-mail from plaintiff's counsel to Everest's claims adjuster, dated November 14, 2016. In that same e-mail, plaintiff's counsel confirmed that Everest's investigator was provided with the contact information of the hospital liaison for Graham's medical services so that Everest could

---

[2] MCL 500.3148 was amended by 2019 PA 21, effective June 11, 2019. The amendments is not relevant to this appeal.

provide "authorization for coverage, in writing, so there is no delay in treatment, including transfer to in-patient rehabilitation." On December 19, 2016, plaintiff's counsel again contacted Everest's claims administrator, advising that two months after submitting a claim for benefits, no response had been received from Everest. On January 5, 2017, counsel for Everest corresponded with plaintiff and plaintiff's counsel by mail, requesting that plaintiff attend an examination under oath.

According to plaintiff's affidavit, in January 2017, three months after Graham's accident, Everest still had not paid any medical bills for Graham's care. On December 21, 2016, plaintiff's counsel filed the instant action, and subsequently filed a motion for declaratory judgment requesting that the trial court order Everest to pay Graham's no-fault benefits, and Everest responded that it was entitled to rescind the no-fault policy on the basis of plaintiff's material misrepresentations in submitting her application for insurance. It was not until after entry of the trial court's February 10, 2017 order directing Everest to pay Graham's medical expenses that Everest informed plaintiff that it was rescinding the no-fault policy.

During a November 19, 2018 hearing on plaintiff's motion for declaratory judgment, interest, and attorney fees, plaintiff's counsel recounted in detail the factual history of plaintiff's claim for no-fault benefits, including that Everest's investigator appeared in Graham's hospital room uninvited and unannounced, and that the conclusion of defendant's investigation in November 2016 revealed that plaintiff had not made any misrepresentations on her insurance application. In response, counsel for Everest stated that he relied on his briefing with respect to whether Everest's decision not to tender no-fault benefits for Graham was reasonable. In ruling on the motion, the trial court expressed its agreement with plaintiff's position that Everest's initial determination to not tender no-fault benefits was unreasonable "for all the reasons that [plaintiff's counsel] indicated[.]"

Challenging the trial court's attorney fee award on appeal, Everest asserts that it acted reasonably by not tendering no-fault benefits to plaintiff for Graham's care, given its reliance on this Court's decision in *Bazzi v Sentinel Ins Co*, 315 Mich App 763; 891 NW2d 13 (2016) ("*Bazzi I*"), aff'd in part and rev'd in part 502 Mich 390 (2018), the time it took to investigate plaintiff's claim, and because the trial court ultimately granted summary disposition in its favor on April 9, 2018, on the basis of plaintiff's material misrepresentations. In Everest's view, the circumstances were such that they presented a factual uncertainty that precluded a finding that its failure to tender PIP benefits was unreasonable under MCL 500.3148(1). See *Moore*, 482 Mich at 520. However, what Everest's argument overlooks is that the trial court's decision to award attorney fees under MCL 500.3148(1) was based on its finding that throughout the lower court proceedings, Everest, while investigating plaintiff's claim and its potential defense of rescission of the policy, did not effectively communicate with plaintiff and her counsel, and its failure to tender no-fault benefits during the period of investigation seriously undermined Graham's medical care and placed his health and physical well-being in jeopardy. Notably, plaintiff's counsel had made Everest aware on at least two occasions that its refusal to tender no-fault benefits was impeding Graham's medical care. Moreover, in the February 2, 2017 motion for a declaratory judgment, plaintiff's counsel stated that Graham's rehabilitation case manager had contacted plaintiff's counsel personally on January 31, 2017, to inform him that Everest was still refusing to pay for medically necessary services for Graham and that medical providers were reluctant or in fact refusing to provide care to him because of Everest's refusal to pay medical expenses.

During the February 10, 2017 hearing on plaintiff's motion for declaratory judgment, the trial court was adamant that any issues with (1) priority between Everest and USAA, and (2) Everest's potential defense of rescission would need to be resolved by the trial court and indemnification would be the appropriate remedy if Everest needed to recoup monies paid on plaintiff's claim, but in the meantime Everest was required to tender no-fault benefits to Graham in accordance with the no-fault policy and the no-fault act. After the trial court entered its February 10, 2017 order, Everest rescinded the no-fault policy, and after plaintiff sought a modification of the trial court's February 10, 2017 order because plaintiff did not have primary health insurance coverage, the trial court again ordered Everest to be responsible for all of Graham's accident-related bills, which at that time were in excess of $500,000. During the March 3, 2017 hearing, the trial court characterized Everest's refusal to comply with the trial court's order to pay Graham's necessary medical expenses as "contemptuous" behavior that may necessitate a contempt hearing.

Various provisions of the no-fault act dictate prompt payment of PIP benefits by an insurer. At the time the trial court entered its attorney fee award, MCL 500.3105 provided, in pertinent part:

> (1) Under personal protection insurance an insurer is liable to pay benefits for accidental bodily injury arising out of the ownership, operation, maintenance or use of a motor vehicle as a motor vehicle, subject to the provisions of this chapter.

> (2) Personal protection insurance benefits are due under this chapter without regard to fault.

Additionally, MCL 500.3112 provided that "[p]ersonal protection insurance benefits are payable to or for the benefit of an injured person or, in case of his death, to or for the benefit of his dependents." MCL 500.3142(1) also provided that PIP benefits "are payable as loss accrues."[3] In *Bazzi II*, the Supreme Court recognized that while the no-fault act requires that PIP benefits be paid in accordance with its terms, a no-fault insurer may nonetheless seek to rescind a no-fault policy on the basis of an insured's fraud because the plain language of the no-fault act does not preclude a no-fault insurer from raising this defense. *Bazzi II*, 502 Mich at 400-401, 406. Likewise, in *Titan*, 491 Mich at 555, the Supreme Court recognized that the doctrine of fraud "may entitle a party to a legal or equitable remedy if a contract is obtained as a result of fraud or misrepresentation," and further stated:

> The legal and equitable remedies for fraud are manifold. Fraud in the procurement of the contract may be grounds for monetary damages in an action at law, see generally *Hord v Environmental Research Institute of Mich*, 463 Mich 399; 617 NW2d 543 (2000), or, as Titan requests in the instant case, grounds to retroactively avoid contractual obligations through traditional legal and equitable remedies such as cancellation, rescission, or reformation, see, e.g., *United States Fidelity* [*& Guaranty Co v Black*, 412 Mich 99, 118 n 10; 313 NW2d 77 (1981)].]

---

[3] MCL 500.3112 and MCL 500.3142 were amended by 2019 PA 21, effective June 11, 2019, but the amendments are not relevant to this appeal.

However, while Everest justifies its decision to not pay Graham's no-fault benefits on the basis of its decision to rescind the no-fault policy, rescission of the no-fault policy is a remedy that the trial court had not yet granted to Everest. In *Lenawee Co Bd of Health v Messerly*, 417 Mich 17, 26; 331 NW2d 203 (1982), the Supreme Court recognized that rescission of a contract is a remedy reserved to the sound discretion of the trial court. See also *United States Fidelity*, 412 Mich at 134 ("Should the trial court find defendants have satisfied their burden of proof in raising the affirmative defense of innocent misrepresentation or that there was silent fraud, *then the court will be given the task of awarding an appropriate remedy*.") (emphasis added). Put simply, while Everest was investigating the alleged misrepresentations in an effort to avoid its obligations under the no-fault policy, it still was responsible to tender payment of PIP benefits in accordance with the terms of the policy (unless rescinded by the trial court), the no-fault act, and then later the trial court's orders. Everest was not permitted to unilaterally and automatically absolve itself of responsibility to tender no-fault benefits without the trial court ordering rescission of the no-fault policy. Under these circumstances, the trial court did not clearly err by finding that attorney fees were justified under MCL 500.3148(1) because Everest unreasonably failed to pay and delayed in making payments required under its policy and the no-fault act.

On cross-appeal, plaintiff challenges the amount of attorney fees awarded, and specifically argues that the trial court erred by not considering her contingency-fee agreement with counsel in determining a reasonable attorney fee award. We disagree.

With respect to the determination of a reasonable fee, in *Pirgu*, 499 Mich at 271, the Supreme Court held that the legal framework for determining reasonable attorney fees set forth in *Smith v Khouri*, 481 Mich 519; 751 NW2d 472 (2008), also applies to an award of attorney fees under § 3148(1). Quoting its earlier decision in *Smith*, the Court in *Pirgu* explained the initial inquiry a trial court is required to make when determining reasonable attorney fees.

> [A] trial court must begin its reasonableness analysis "by determining the fee customarily charged in the locality for similar legal services" and then multiplying that number "by the reasonable number of hours expended in the case." After a trial court has calculated this baseline figure, it must consider and briefly discuss on the record the remaining [*Wood v DAIIE*, 413 Mich 573; 321 NW2d 653 (1982)], factors and the factors in MRPC 1.5(a) to determine whether any up or down adjustments from the base number are appropriate. [*Pirgu*, 499 Mich at 276, quoting *Smith*, 481 Mich at 530-531 (opinion by TAYLOR, C.J.).]

In *Pirgu*, the Court recognized that Chief Justice TAYLOR, writing the lead opinion, and Justice CORRIGAN, writing a concurring opinion, disagreed in *Smith* with regard to whether two factors should apply when the trial court considers an attorney fee award under MCR 2.403(O)(6)(b) for case evaluation sanctions. *Id*. at 276-277. These factors were " '[t]he results obtained" and "the nature of the fee arrangement," but the Court in *Pirgu* held that these were both relevant factors to consider in determining a reasonable attorney fee under MCL 500.3148(1). *Pirgu*, 499 Mich at 276-277. Therefore, in determining reasonable attorney fees under MCL 500.3148(1), the trial court must first engage in the following inquiry:

> In sum, we hold that when determining the reasonableness of attorney fees awarded under § 3148(1), a trial court must begin its analysis by determining the

-14-

reasonable hourly rate customarily charged in the locality for similar services. The trial court must then multiply that rate by the reasonable number of hours expended in the case to arrive at a baseline figure. Thereafter, the trial court must consider all of the remaining *Wood* and MRPC 1.5(a) factors to determine whether an up or down adjustment is appropriate. [*Pirgu*, 499 Mich at 281.]

Because *Wood* and *Smith* contained two different lists of factors to be considered, some of which were duplicative, to assist trial courts in their analysis, the Court in *Pirgu* refined the legal framework as follows:

> (1) the experience, reputation, and ability of the lawyer or lawyers performing the services,
>
> (2) the difficulty of the case, i.e., the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly,
>
> (3) the amount in question and the results obtained,
>
> (4) the expenses incurred,
>
> (5) the nature and length of the professional relationship with the client,
>
> (6) the likelihood, if apparent to the client, that acceptance of the particular employment will preclude other employment by the lawyer,
>
> (7) the time limitations imposed by the client or by the circumstances, and
>
> (8) whether the fee is fixed or contingent. [*Pirgu*, 499 Mich at 282.]

This list of factors is not exclusive. *Id*. To allow for meaningful appellate review, the trial court "should briefly discuss its view of each of the factors above on the record and justify the relevance and use of any additional factors." *Id*.

At the time the trial court awarded no-fault penalty interest, MCL 500.3142 provided:

> (1) Personal protection insurance benefits are payable as loss accrues.
>
> (2) *Personal protection insurance benefits are overdue if not paid within 30 days after an insurer receives reasonable proof of the fact and of the amount of loss sustained*. If reasonable proof is not supplied as to the entire claim, the amount supported by reasonable proof is overdue if not paid within 30 days after the proof is received by the insurer. . . . .
>
> (3) An overdue payment bears simple interest at the rate of 12% per annum. [Emphasis added.]

The penalty-interest provision of MCL 500.3142(2) is intended to penalize no-fault insurers that are dilatory in paying no-fault claims. " 'Penalty interest must be assessed against a no-fault

-15-

insurer if the insurer refused to pay benefits and is later determined to be liable, irrespective of the insurer's good faith in not promptly paying the benefits.' " *Williams*, 250 Mich App at 265.

Plaintiff's counsel submitted an affidavit in which he averred that he is a partner with the law firm of Powers Chapman, a 1986 graduate of Detroit College of Law, and had practiced law in Michigan for 32 years. The sole focus of his practice was representing injured plaintiffs in civil litigation, and he specialized in automobile liability and claims under the no-fault act. According to plaintiff's counsel, he spent a great deal of time on plaintiff's case because of Everest's unreasonable refusal to pay no-fault benefits for Graham. Plaintiff's counsel submitted billings from his law firm for his work on plaintiff's case spanning the time period of October 16, 2016, until October 9, 2018, in the amount of $50,300.

At the November 19, 2018 motion hearing, the trial court inquired of plaintiff's counsel why he should be awarded attorney fees under MCL 500.3148(1) for the time period after which Everest paid no-fault benefits on Graham's behalf, considering that the purpose of the statute is to penalize insurers for unreasonably withholding payment of no-fault benefits. At one point, the court noted that after plaintiff's counsel made sure that Graham's medical bills were paid, "then you were just observing frankly the dispute between [Everest and USAA] and Titan." Plaintiff's counsel responded that it was necessary to file the complaint to ensure that Everest paid its obligations under the no-fault policy and the no-fault act, and counsel needed to stay in the case for its duration to protect plaintiff's and Graham's interests. After counsel for Everest pointed out that MCL 500.3148(1) only contemplates attorney fees that arise from an insurer's unreasonable denial of a claim or unreasonable delay in paying benefits, and that attorney fees for plaintiff's counsel would cease once Everest satisfied its obligation to pay no-fault benefits, plaintiff's counsel argued that the trial court should consider the contingency-fee arrangement between plaintiff and her counsel in determining a reasonable attorney fee award. The trial court observed that plaintiff's case did not proceed to trial. Plaintiff's counsel also noted that in April 2017, almost $500,000 in medical bills were paid on behalf of Graham by Titan, and asked, "so why wouldn't I be considered for one-third of that[?]" The trial court responded:

> But I think that the intent of [MCL 500.3148] is to penalize the insurance company for the refusal to pay. And I think that if the insurance company at some point in time makes payments during the litigation, then it wouldn't be fair to let that attorney fee continue to run.

The trial court clarified that "during the time period we're talking about," from October 16, 2016, to April 25, 2017, Everest's refusal to pay no-fault benefits was unreasonable, which according to the trial court's calculations equated to 76.25 hours of plaintiff's counsel's time. The court also determined that $400 was a reasonable hourly rate for plaintiff's counsel, and ultimately ordered Everest to pay attorney fees in the amount of $30,500.

In support of her argument that the trial court did not properly consider the contingency-fee arrangement between plaintiff and her counsel, plaintiff relies on this Court's decision in *Hartman v Assoc Truck Lines*, 178 Mich App 426; 444 NW2d 159 (1989). In *Hartman*, the plaintiff requested attorney fees in the amount of $20,000, and the trial court ultimately awarded $5,804. *Id*. at 428. In that case, the plaintiff had prevailed on a motion for summary disposition, and the trial court disregarded the argument of plaintiff's counsel that the contingency-fee

agreement between the plaintiff and his counsel should be considered, and instead focused on the time the plaintiff's counsel spent on the case and the hourly rate. *Id.* at 429-430. This Court reversed, concluding that the trial court's ruling showed that it focused primarily on the hourly rate of the plaintiff's counsel and the time expended on the case, and did not weigh the other relevant factors set forth in *Wood*. *Hartman*, 178 Mich App at 430. This Court further stated:

> One consequence of a contingent fee agreement is the risk undertaken by the attorney and client that the attorney's recovery of attorney fees is dependent on the client's recovery. The attorney may recover nothing or the attorney may benefit from the arrangement by recovering a larger fee than would result from merely considering the skill, labor and time involved in the lawsuit. The client, in some circumstances, may be unable to proceed with the lawsuit without the availability of the contingent fee agreement. Once the client recovers, however, the client is obligated to pay the attorney fees under the terms of the contingent fee agreement, notwithstanding the amount which a trial court may determine to be reasonable. Thus, in reviewing the reasonableness issue, it is important to keep in mind that it is the client who will ultimately pay the difference, if any, between a contingent fee agreement (the reasonableness of which is not contested in this case) and the attorney fees allowed by a trial court under [MCL 500.3148(1).] [*Hartman*, 178 Mich App at 430-431.]

This Court instructed the trial court on remand to consider the contingency-fee agreement because it was relevant to one of the *Wood* factors, that being the relationship between the plaintiff and his counsel, and further reminded the trial court that a proper exercise of its discretion would entail weighing all of the *Wood* factors, rather than only a "rigid" consideration of the hourly rate of plaintiff's counsel and the amount of time the plaintiff's counsel had expended on the case. *Id.* at 432.

We note, preliminarily, that plaintiff only challenges what she characterizes as the trial court's failure to consider the contingency-fee agreement between plaintiff and her counsel. Likewise, Everest does not challenge the trial court's calculation of the hourly rate of plaintiff's counsel, or the amount of time that plaintiff's counsel spent on the case, or the weighing of any other factor relevant to the attorney fee determination. Additionally, *Hartman* is distinguishable from this case because the trial court here did not rigidly focus only on the hourly rate of plaintiff's counsel and the amount of time spent on the case. Instead, the record reflects that the court considered other factors relevant to the attorney fee determination as set forth in *Pirgu*, 499 Mich at 282, including the reputation, ability, and professional experience of plaintiff's counsel, the difficulty of the case, the results that plaintiff's counsel obtained, the length and nature of the professional relationship between plaintiff and her counsel, and whether accepting the case on plaintiff's behalf precluded counsel from pursuing other cases. Contrary to plaintiff's assertion on cross-appeal, the trial court *did* consider the fact that plaintiff and her counsel had entered into a contingency-fee agreement. However, as this Court observed in *Pirgu*, the list of factors it set forth is not exclusive, and the trial court may consider other factors that it deems relevant. *Id.*

In rejecting plaintiff's argument that the contingency-fee agreement warranted increased attorney fees as requested by plaintiff, the trial court noted that after Everest paid the no-fault benefits it owed on April 25, 2017, and the MAIPF took over servicing the claim for Graham's

no-fault benefits, plaintiff's counsel was not required to be actively involved in the case for the duration of the lawsuit to further protect plaintiff's interests. We note that plaintiff's counsel's description of activities in support of the request for attorney fees confirms that the majority of his work was spent securing the initial payment of no-fault benefits by Everest in the early stages of the case. Moreover, the trial court correctly noted that the purpose of MCL 500.3148(1), the statute under which attorney fees were authorized, is to ensure prompt payment to the insured, *Beach*, 216 Mich App at 629, and any such issue with the unreasonable withholding of no-fault benefits was rectified in April 2017, when Everest paid no-fault benefits on behalf of Graham before Titan took over payment of no-fault benefits. In our view, this was an appropriate and relevant consideration.

In sum, the record discloses that the trial court *did* consider the existence of the contingency-fee agreement and reasonably concluded that it did not warrant an increase in plaintiff's attorney fees under the circumstances, where Everest's payment of no-fault benefits was secured early in the proceedings. Accordingly, we are not persuaded that the trial court's determination of a reasonable attorney fee fell outside the range of reasonable and principled outcomes. *Pirgu*, 499 Mich at 274.

Finally, Everest maintains that the trial court erred by awarding penalty interest under MCL 500.3142(2) because plaintiff did not present the required reasonable proof to support her claim. Specifically, Everest acknowledges that plaintiff presented bills in support of her motion for declaratory judgment, but asserts that "the billings did not include any proofs that [they] were related to the accident[.]" We disagree.

In support of her request for penalty interest under MCL 500.3142(2), plaintiff included a copy of a facsimile transmission she sent to Everest's claims adjuster on October 21, 2016, which included a bill from St. John Hospital and Medical Center for services rendered beginning October 18, 2016, with a total balance owing of $274,328.29. Everest, on the other hand, asserted that it was not dilatory in paying Graham's medical bills, and that plaintiff had not provided reasonable proof of the fact and amount of loss sustained as required by MCL 500.3142(2).

During the November 19, 2018 hearing on plaintiff's motion for declaratory judgment, interest, and attorney fees, the trial court and counsel for plaintiff discussed how Titan had paid the hospital's medical bill in the amount of $274,328.29 on April 25, 2017, as well as other outstanding medical bills for Graham in the amount of $493,000. According to counsel for Everest, Everest paid $138,401.97 for Graham's inpatient rehabilitation services. Counsel for Everest pointed out that there was no documentary proof that the submitted bills were for medical treatment related to the motor vehicle accident. However, counsel acknowledged, in response to an inquiry by the trial court, that "there's never been a dispute that [Graham's] injuries were related" to the motor vehicle accident. Given the tenuous argument by counsel for Everest on the issue whether plaintiff had presented reasonable proof of the fact and amount of the loss sustained as contemplated by MCL 500.3142(2), the trial court urged counsel for Everest "to [either] fish or cut bait," and counsel then conceded that he did not have caselaw to support his challenge to the medical billings submitted by plaintiff to Everest. The trial court also observed that it was clear that the hospital's medical billings were reasonable proof of the amount and fact of plaintiff's loss arising from Graham's medical treatment.

Counsel for plaintiff then calculated that 12% interest on the $274,328.29 amount would have begun to accrue on November 21, 2016, 30 days after Everest received the medical billings, resulting in interest in the amount of $6,042,73, with interest charged at the rate of $90.19 a day until January 27, 2017, when another medical payment that included the $274,328.29 was 30 days overdue. With regard to medical bills of $369,573.57, plaintiff's counsel calculated that plaintiff incurred total interest of $10,692, with 12% interest accruing daily in the amount of $121.50 a day for 88 days from January 27, 2017, until the bills were paid on April 25, 2017. Counsel for Everest did not dispute these calculations, and the trial court ultimately ordered Everest to pay $16,734.72 in penalty interest under the no-fault act.

On appeal, Everest does not challenge the trial court's calculation of penalty interest under MCL 500.3142(2) or the fact that it received notice of the fact of plaintiff's loss and the amount sustained by way of the medical billings. Rather, citing MCL 500.3142(2), Everest claims that the requirement of the statute, that an insurer receive reasonable proof of the fact and the amount of the loss, was not satisfied because the medical bills provided to Everest "did not include any proofs that the billings were related to the accident." Notably, aside from quoting the language of MCL 500.3142(2), Everest does not cite any caselaw in support of its argument. In any event, the argument is not persuasive.

In *Williams*, 250 Mich App at 266, the defendant insurance company argued that its obligation to pay the plaintiff's medical expenses did not arise until it received copies of the amounts it was required to pay, which did not occur until it received explanation-of-benefit forms from the plaintiff's medical insurer showing what the medical insurance company had paid. However, the trial court had held that penalty interest began to accrue on August 17, 1997, a month after the plaintiff sent the defendant a letter that included a statement from the hospital of the amount due and owing for the plaintiff's medical services. *Id*. at 265. This Court disagreed with the defendant's argument, noting that the defendant did not dispute being aware of the plaintiff's loss and that the plaintiff had been treated at a hospital during the time period from July 1996 to November 1996. *Id*. at 266. Under the circumstances, particularly because the defendant was aware of its obligation under the policy to pay uncoordinated no-fault benefits, this Court concluded that the July 17, 1997 letter from the plaintiff to the defendant insurance company, which included a statement from the hospital for its services, satisfied the requirement of MCL 500.3142(2) that the plaintiff provide proof of the fact and the amount of loss sustained. *Id*. at 267. In so ruling, this Court rejected the defendant's argument that the defendant's obligation to pay the plaintiff's no-fault benefits did not arise until the defendant was notified of the exact amount owed, observing that the statute only called for "*reasonable* proof." *Id*. at 267. (Emphasis in original.) To hold otherwise, this Court reasoned, would subvert the underlying purpose of the no-fault act, which is to make sure that victims of motor vehicle accidents are provided with "assured, adequate, and prompt reparations." *Id*. Moreover, this Court stated that if the defendant insurance company had wished to further investigate what the plaintiff's medical insurance provider had paid, once provided with the July 17, 1997 documentation from the plaintiff, it could have looked into the matter further. *Id*. Similarly, in the present case, it would undermine the purpose of the no-fault act to ensure that Graham was provided with assured and timely reparations for his catastrophic injuries following the motor vehicle accident if Everest is permitted to claim that interest did not accrue because it was not provided with proof that the medical bills were related to the motor vehicle accident.

-19-

It is undisputed that Graham suffered serious, catastrophic injuries in the motor vehicle accident in question. There is no evidence suggesting that his medical treatment was related to any other cause or condition. Like the defendant in *Williams*, if Everest had any serious doubts about whether his medical treatment was necessitated by the motor vehicle accident, it could have sought and clarified the necessary proof it required during the 30-day grace period allowed by MCL 500.3142(2). *Williams*, 250 Mich App at 267. Under these circumstances, Everest has not demonstrated that the trial court clearly erred by finding that plaintiff provided Everest with reasonable proof of the fact and amount of the loss sustained, and that penalty interest was warranted under MCL 500.3142(2).

## IV. CONCLUSION

The trial court did not err by revisiting its April 9, 2018 decision to grant summary disposition in favor of Everest after the Supreme Court decided *Bazzi II*, and it did not abuse its discretion by balancing the equities to determine that Everest was not permitted to rescind its no-fault insurance policy with respect to PIP coverage for Graham, an innocent third party. Further, the trial court did not err by awarding plaintiff no-fault attorney fees and penalty interest, or abuse its discretion by determining a reasonable attorney fee award.

Affirmed.

/s/ Christopher M. Murray
/s/ Kathleen Jansen
/s/ Jane E. Markey

-20-